FILED

2023 Mar-30  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| MEDICAL PROPERTIES TRUST, INC., | |
| Plaintiff, | |
| -v.- | Civil Action No. _____ |
| VICEROY RESEARCH LLC; FRASER JOHN PERRING; GABRIEL BERNARDE; and AIDAN LAU, | |
| Defendants. | |

## COMPLAINT

Plaintiff Medical Properties Trust, Inc. ("MPT" or the "Company"), by and through its undersigned counsel, alleges, upon knowledge as to itself and its own acts and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This action arises from a campaign to defame, injure, and drive down the stock price of MPT, one of Alabama's largest public companies and its largest real estate investment trust ("REIT").

2.      Defendant Viceroy Research LLC ("Viceroy") and its members, Defendants Fraser John Perring, Gabriel Bernarde, and Aidan Lau, are in the

business of mounting serial short-and-distort attacks against public companies. MPT is their latest victim.

3.     The playbook for these attacks is simple:  Take a short position in a stock or partner with someone who has one, publish false "research" critical of the target company, amplify the false claims on social media, and then reap a profit— either directly, from the stock price drop you bet on and then caused, or indirectly, by collecting payments from other market players who profited on the drop.

4.     Perring—a self-proclaimed "Grand Poobah" of short-sellers—entered the distortion game after British regulators revoked his social work license upon finding that he had lied and fabricated evidence.  Perring founded Viceroy with Bernarde and Lau in 2016, and the firm has become notorious for short-and-distort schemes.  In 2021, for example, a South African regulator fined Viceroy's members millions of dollars for spreading false and misleading claims about a South African bank on behalf of a hedge fund that was trying to drive down the bank's stock price.  Defendants escaped justice, however, when a tribunal vacated the penalty for a jurisdictional defect.

5.     Short-selling is not illegal in the United States, and criticism of public companies is integral to our capital markets.  Nor is it illegal to couple short-selling with criticism of a target company, provided the speaker does not deliberately or recklessly misrepresent facts for profit.  But Viceroy does not play by the rules.

And for months, the firm, its members, and their cohorts have been spreading malicious falsehoods about MPT.

6.     In late January 2023, Viceroy announced that it held a short position in MPT and simultaneously published the first of 14 "reports" on the Company it would issue in a steady stream over the ensuing weeks.  The thrust of most of these reports is that MPT purportedly engages in illegal "round-trip" transactions by "overpaying" owners of hospital properties and leasing those properties back to the sellers, who then operate the hospitals and return the "overpayments" to MPT in the form of rent.  The reports also accuse MPT executives of engaging in "fraud" and juicing their own compensation.

7.     Meanwhile, on Twitter—using the hashtags "#fraud" and "#ponzi scheme"—Perring has pumped Viceroy's false claims while urging investors to dump MPT stock, accusing MPT of "involvement in #Corruption" and "scamming investors," and promising his tens of thousands of followers that MPT's "employees will go to prison."

8.     These accusations are malicious fiction, concocted to manipulate the market and to drive profits from short-selling.  As outrageous as they are, Defendants' falsehoods have influenced the market and caused serious harm to MPT.  Since Viceroy began its attacks, MPT's stock price is down over 35 percent, a potential counterparty has pulled away from of a commercial transaction, and

MPT has had to increase physical security at its Birmingham headquarters. Several analysts who follow MPT have observed the impact that the short attack has had on the stock.  Recently, a prominent REIT analysis firm observed that "an investigative investment research firm focused on short selling"—*i.e.*, Viceroy— had "contributed to the sell-off" in MPT's shares with a series of "negative notes."

9.      Sometimes charlatans spread their lies to no effect.  That, unfortunately, is not the case here.  MPT brings this action to stop Defendants repeating their lies, to recover damages for the harm caused by those lies, and to compel Defendants to disgorge the ill-gotten gains earned on the back of those lies.

## THE PARTIES

10.      Plaintiff MPT is a REIT that acquires, develops, and invests in community healthcare facilities across the United States and internationally.  Since its founding in 2003, MPT has been incorporated under the laws of Maryland and has maintained its headquarters and principal place of business in Alabama.

11.      Defendant Viceroy Research LLC is a self-described "financial research" firm that publishes negative content about public companies whose shares it has sold short.  Viceroy is a limited liability company organized in Delaware.  Its co-founders are Defendants Fraser John Perring, Gabriel Bernarde, and Aidan Lau, who are also, on information and belief, its members.  On information and belief, Viceroy has no headquarters or employees, observes few if

any corporate formalities, and exists solely to shield its owners from personal liability for their short-and-distort schemes.  Because there is no genuine separation or distinction between Viceroy and its members, Viceroy's limited liability structure does not shield Perring, Bernarde, and Lau from personal liability for Viceroy's tortious and unlawful actions.

12.     Defendant Fraser John Perring is, on information and belief, a citizen and resident of the United Kingdom.

13.     Defendant Gabriel Bernarde is, on information and belief, a citizen and resident of Australia.

14.     Defendant Aidan Lau is, on information and belief, a citizen of France and a resident of Australia.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

16.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in the Northern District of Alabama.

17.     The Court has personal jurisdiction over all Defendants because the conduct giving rise to this action involved substantial contacts with the State of

Alabama.  Such contacts include, among other things: expressly and intentionally directing defamatory statements at MPT and its Alabama-based personnel; expressly and intentionally directing communications at an Alabama audience, including by communicating with known Alabama residents; and expressly and intentionally making defamatory accusations of fraud which purportedly occurred in Alabama.  Defendants knew, at all relevant times, that MPT maintains its principal place of business in Alabama and that MPT would suffer the harmful effects of Defendants' conduct in Alabama.  And MPT did, in fact, suffer such harmful effects in Alabama.

## FACTUAL ALLEGATIONS

### A.    MPT's history and business

18.    MPT was founded in 2003 by Edward K. Aldag, Jr., R. Steven Hamner, and Emmett E. McLean.  Aldag serves as MPT's Chief Executive Officer, Hamner as Chief Financial Officer, and McLean as Chief Operating Officer.

19.    Since July 2005, MPT has been publicly traded on the New York Stock Exchange under the ticker symbol "MPW."

20.    MPT's primary business is to acquire and develop healthcare facilities like hospitals and lease them to operating companies under long-term net leases. Net leases require tenants to bear most of the costs associated with the properties,

including maintenance.  MPT often partners with hospital operators in acquiring

facilities:  MPT buys the real estate, the operator buys the operations, and MPT

then leases the real estate to the operator.  Most of MPT's leased assets are wholly

owned by MPT.  Some are owned through joint ventures with partners who share

the Company's view that healthcare facilities are integral to community

infrastructure.

21.    On occasion, MPT funds capital expenditures in connection with an

acquisition—where, for example, significant improvements will be needed to

operate successfully for the long term.  MPT also sometimes funds the

development of new facilities with a plan to lease to an operator-tenant upon

completion.  In both cases—upfront capital investment and new development—the

funds that MPT contributes are added to the lease base and thus reflected in the

rent the tenant pays over time.

22.    A typical MPT lease provides for a term of at least 15 years with a

series of shorter renewal options, rent set at a fixed percentage of the lease base,

and an annual escalator pegged to inflation.

23.    MPT has other financial arrangements with healthcare operators.

Sometimes, instead of buying real estate and leasing it to an operator, MPT makes

a mortgage loan secured by the operator's own real estate.  MPT also sometimes

invests directly in operators in exchange for a profit or equity interest that provides for certain minority rights and protections and enhances MPT's overall return.

24.     At the core of all these financial arrangements is an overriding goal to make sound investments in hospital real estate that will generate steady, long-term returns for MPT's investors.  Achieving that goal requires underwriting real estate investments that are attractive to hospital operators, so that if a given operator is unable to continue paying rent then a replacement operator can readily assume the lease.  Among the characteristics MPT looks for in evaluating hospital real estate are:  (1) good physical quality reflecting a history of maintenance and improvements; (2) location in a strong market, with measurable patient demand growth, sustainable reimbursement sources, and features that attract a dedicated workforce; (3) a geographic environment in which the operator is likely to hold a strong competitive position; and (4) facility-level operations with strong EBITDARM (earnings before interest, taxes, depreciation, amortization, rent, and management fees) coverage of lease payments.  A medical facility meeting these criteria is in all likelihood the product of true community need—meaning that its success is not dependent on a given operator, and it has strong potential to generate steady returns even if an operator encounters financial difficulty.

25.     MPT's underwriting model has been tested and proved.  In 2022, for example, private equity firm Macquarie Asset Management ("Macquarie")

acquired as part of a 50/50 partnership with MPT a portfolio of eight Massachusetts hospitals for a total purchase price of about $1.7 billion.  The transaction validated MPT's original underwriting:  MPT had purchased these eight hospitals (plus a ninth) from hospital operator Steward Health Care System LLC ("Steward") in 2016 and 2018 for a combined cost of approximately $1.3 billion, and had then leased the premises to Steward as operator.  The properties had performed as hoped, yielding approximately $475 million in income for MPT from 2016 to 2022, and then were sold at a healthy profit.

26.    The model has been stress-tested too, again with success.  In October 2022, for example, operator-tenant Pipeline Health System, LLC ("Pipeline"), which leases and operates several MPT-owned hospitals in Los Angeles, California, suffered losses connected to its operations in Chicago (with which MPT had no involvement) and filed for Chapter 11 bankruptcy.  This was a contingency for which MPT had planned.  Consistent with MPT's model, the underwriting for the L.A. hospitals had focused on the strength of the individual facilities, and the master lease MPT had executed mitigated the risk to the Company in the event of the operator-tenant's bankruptcy.  In February 2023, Pipeline emerged with a plan of reorganization pursuant to which it will continue as operator of the L.A. hospitals and pay all rent accrued during the bankruptcy period.  To date, Pipeline has already repaid MPT for all rent that was outstanding as of December 31, 2022,

along with what was due for January and February 2023.  Approximately 30% of the remaining rent in 2023 will be deferred for a period, but will be paid in full with interest in 2024.

27.    With investments in 444 facilities—427 of which are leased to 55 tenants—and revenues exceeding $1.5 billion in 2022, MPT is one of the largest REITs in the healthcare sector and among the largest publicly traded companies in Alabama, where the majority of its employees are based.

28.    As a public company, MPT is required to have its annual financial statements audited by an independent public accounting firm. PricewaterhouseCoopers LLP ("PwC") has served as MPT's independent auditor since 2008.

29.     Every year from 2008 to the present, PwC has issued an unqualified opinion that MPT's financial statements "present fairly, in all material respects, the financial position of" the Company and "the results of its operations and its cash flows" for the relevant periods in conformity with generally accepted accounting principles.

**B.    Short-and-distort campaigns**

30.    To sell a stock "short" is to bet its price will fall.  To place the bet, the short-seller borrows the stock from a broker, sells it, and retains the proceeds—all with a plan to buy replacement shares back later at a lower price.  If the bet is right,

and the stock price declines, the short-seller can count as profit the difference between the price he was able to get before the drop and what he had to pay later to buy the replacement shares for the broker (that is, to "close out" the short position). Because a stock's price can never fall below $0, the short-seller's potential gains are capped at the proceeds from his initial sale. But because there is no limit to how high a stock price can rise, and because a short-seller must eventually close out his position, the potential losses are uncapped. Short-sellers, in other words, face unlimited downside risk.

31.     As a result, some short-sellers choose to load the dice: By publishing, funding, or otherwise promoting false and misleading information about the companies they bet against, short-sellers can drive down those companies' stock prices and generate profit for themselves. Investment analysts without short positions but who recommended that their readers short a company might also join in to preserve their reputations and maximize subscription dollars.

32.     Short-selling is legal in this country. Publishing false information to maximize profits and artificially shield against losses from short-selling is not. These "short-and-distort" campaigns are recognized by the U.S. Securities and Exchange Commission as a form of illegal market manipulation.[1]

---

[1] *See* Short Position and Short Activity Reporting by Institutional Investment Managers, 87 Fed. Reg. 14950, 14991-92 (Mar. 16, 2022) (to be codified at 17 C.F.R. pts. 240, 242, and 249).

### C.   Viceroy and Perring's documented history of dishonesty and fabrication

33.    Before crowning himself a "Grand Poobah" of short-selling, Perring was a social worker in Lincolnshire County, England.  He resigned after the Health Professions Council, a public regulatory body for social workers in the United Kingdom, investigated his failure to notify a young child's aunt and uncle before recommending that the child be put up for adoption—a recommendation that, had it been accepted, would have had "extreme" consequences for the child.[2]  The Council found that Perring subsequently "created false records" to "cover up" "his significant failure," and then threatened to refer his manager to the police when confronted.[3]  Ultimately, the Council determined that Perring had engaged in "deliberate, persistent and dishonest conduct," and created the "significant" potential for "serious harm."[4]  Concluding that Perring's "outright dishonesty would be regarded as such by right thinking members of society," and "in view of the seriousness of the case," the Council found Perring unfit to practice and stripped him of his license.[5]

34.    Following the revocation of his social work license, Perring published market commentary on a Blogspot website, and eventually began a research

---

[2] Fraser John Perring (Health Professions Council Feb. 3, 2014), https://ffj-online.org/wp-content/uploads/2019/10/FP-HCPTS-Record-.pdf.
[3] *Id.* ¶¶ 40, 55, 65, 67, 72, 79.
[4] *Id.* ¶¶ 40, 50, 79, 81.
[5] *Id.* ¶¶ 41, 74.

partnership with an investor named Matthew Earl.  In an interview with The

Foundation for Financial Journalism (the "FFJ"), an independent nonprofit, Earl

accused Perring of plagiarizing research, impersonating professional contacts, and

proposing an insider trading scheme.  *See* Roddy Boyd, *Fraser Perring:*

*Chronicles of Deceit, Part I*, The Found. for Fin. Journalism (Nov. 4, 2019).[6]

(When asked about the insider trading allegation, Perring replied:  "I don't

comment on anecdotes."[7])  The FFJ's investigation also found that Perring

pretended to live in an apartment he did not own and fabricated a friendship with

an imaginary wealthy friend who Perring's acquaintances never got to see.[8]  The

FFJ concluded that "lying became central to how [Perring] operated

professionally."[9]

35.    Perring formed Viceroy in 2016 when, according to Viceroy's

website, he "was introduced to Bernarde and Lau by a mutual contact who

recommended he collaborate with the young Australians."[10]  Bernarde and Lau,

like Perring, have no institutional investment experience.  Yet in 2018, a prominent

short-seller noted, next to a smiling Bernarde, that Bernarde is "the brains behind

Viceroy Research."

---

[6] https://ffj-online.org/2019/11/04/fraser-perring-chronicles-of-deceit-part-one/.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *About Viceroy Research*, Viceroy Research, https://viceroyresearch.org/about/ (last visited
Mar. 19, 2023).

36.     Viceroy's business consists of taking short positions in public companies and then disseminating negative information about those companies through public reports and social media posts in order to drive down the price of the companies' stock.  Viceroy typically publishes numerous reports on the companies it attacks—at times, multiple reports per week.

37.     In January 2018, Viceroy trained its sights on Capitec, a South African bank, calling the institution "[a] wolf in sheep's clothing" and a "loan shark . . . masquerading as a community microfinance provider."[11]  Within a day, Capitec's stock price had declined by about 25 percent.[12]

38.     Viceroy's report and its ensuing six-month campaign against Capitec triggered an investigation by South Africa's financial regulators.  The Financial Sector Conduct Authority ("FSCA") fined Viceroy's members 50 million Rand (about $2.8 million today) for having "made a concerted effort to publish . . . false, misleading and deceptive [statements] regarding material facts" and having demonstrated "no interest in setting the record straight" when "presented with clear explanations for why their statements had been false."[13]  The Authority also noted

---

[11] *Capitec – A wolf in sheep's clothing*, Viceroy Research (Jan. 30, 2018), https://viceroyresearch.org/2018/01/30/capitec-a-wolf-in-sheeps-clothing.
[12] Tiisetso Motsoeneng & Nqobile Dludla, *South Africa's Capitec falls 25 pct after report by Viceroy Research*, Reuters (Jan. 30, 2018 7:23 AM), https://reuters.com/article/ozabs-us-capitec-accounts-idAFKBN1FJ1MW-OZABS.
[13] Financial Sector Conduct Authority, Administrative Penalty Order in Terms of Section 167 of the Financial Sector Regulation Act 9 of 2017 ¶¶ 4.4.2, 4.4.5 (Sept. 8, 2021),

that it "had to enlist the assistance of a foreign regulator to compel a representative of [Viceroy] to be questioned under oath."[14]

39.    All the while, Viceroy had been doing a hedge fund's bidding.  South Africa's Financial Services Tribunal found that Viceroy had agreed to "assist [the hedge fund] in shorting securities in any chosen company" for "a monthly retainer" of $10,000 and a cut of the profits from the hedge fund's trades.[15]  Viceroy produced its false report "under th[is] agreement" and earned an estimated $744,000 from the short-and-distort conspiracy.[16]

40.    Ultimately, none of Defendants were held to account for the Capitec short-and-distort scheme because the Financial Services Tribunal concluded— without disturbing the lower tribunal's findings of fact—that the FSCA lacked personal jurisdiction over the perpetrators.[17]

---

https://www.fsca.co.za/Enforcement-Matters/Documents/Penalty%20Order-DMA403.pdf?csf=1&e=6TXqCH.

[14] *Id.* ¶ 4.2.

[15] Financial Services Tribunal, In re: Viceroy Research Partnership LLC, et al. (Nov. 16, 2022) ¶ 23, https://www.fsca.co.za/Enforcement-Matters/Publications%20and%20Documents/Decision%20-%20Viceroy%20Research%20Partnership%20LLC%20v%20FSCA%20and%20Others.pdf.

[16] *Id.* ¶ 24.

[17] *Id.* ¶ 58.

**D.     Defendants' short attack on MPT**

41.     On January 26, 2023, Viceroy published its first "report" attacking MPT, titled "Medical Properties (dis)Trust."  Viceroy admitted in its January 26 report and on Twitter that "Viceroy Research is short $MPW."

42.     The same day, Viceroy, Perring, and Bernarde all used their Twitter accounts to promote the report and launch a vitriolic social media campaign against MPT.  To drive home the defamatory accusations against MPT, Perring tagged his posts using the hashtag "#fraud."  Over the ensuing weeks and months, Viceroy published many more reports, at regular intervals, all promoted through the same concerted campaign.  The total count as of this filing is 14 reports purporting to show the results of "research" on various aspects of MPT's business.[18]  And Defendants have worked with other self-described "researchers" motivated to drive down MPT's stock price to promote and amplify their reports.

43.     Defendants purport in these reports—and in a February 2, 2023 letter to PwC they posted on Twitter[19]—to analyze and find wanting the accounting treatment MPT has applied in its financial statements.  They do this in the face of the auditor's unbroken chain of unqualified opinions as to those financial statements.

---

[18] *See* Exhibit 1 hereto.
[19] *See* Exhibit 2 hereto.

44.     Market commentators are free to offer critical opinions about MPT, and some of the vitriol and nonsense Defendants have spewed in their reports and related social media commentary falls within the wide berth granted by the First Amendment.  But an unconscionably large amount of it does not.  In an effort to drive profits for themselves, Defendants have engaged in a coordinated campaign to disseminate false, misleading, and defamatory statements about MPT, all with knowledge or reckless disregard of the statements' falsity.

45.     The most blatant and inflammatory of these statements fall into four categories: (1) false accusations of revenue "round-tripping"; (2) false characterizations of MPT's executive compensation formula; (3) false accusations of lying about dealings with operator-tenant Steward; and (4) false accusations of fraud and criminal activity.

46.     **Allegations of revenue "round-tripping."**  In accounting, "round-tripping" or a "round robin" scheme refer to inflation of revenue through no-profit transactions.  In such a scheme, a party engages in an uneconomic transaction as a way to provide funds to a counterparty.  The counterparty later sends those same funds back in a second transaction to be recorded as revenue by the original party.  This inflates revenue because the counterparty would not have engaged in the transaction or would not have paid the same price without the uneconomic cash infusion.

47.     Defendants' statements about MPT abound with false accusations that the Company has engaged in revenue round-tripping with tenants.  In its very first tweet about MPT on January 26, 2023, Viceroy claimed that MPT's "[r]ent is round-tripped via 'fake' purchases of massively inflated assets."  In the opening sentence of its report released the same day, Viceroy wrote that MPT "has engaged in billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and / or theft."  Viceroy went on to claim that "MPW has engaged in billions of dollars of uncommercial sale-leaseback transactions," and "MPW appear to constantly overpay for fire sale assets, sometimes by as much as 10x, which in-turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term."

48.     On February 1, 2023, in response to a "JP Morgan analyst" who supposedly criticized "[his] report," Bernarde tweeted that "[p]ooling uncreditworthy tenants into a REIT and capitalizing a rent round-robin scheme really does make the tenants appear more credit worthy."

49.     Viceroy claimed to have evidence supporting its accusations.  In its February 2, 2023 letter to PwC posted to Twitter, Viceroy wrote:

> ▪ MPW and most of its major tenants enjoy a mutually parasitic relationship. We have evidenced over $2b, net, of uncommercial cash outflows capitalized in MPW's balance sheet and round tripped to MPW by counterparties: its tenants.

> ▪ Viceroy Research have highlighted numerous uncommercial transactions which substantiate our belief that MPW round-trips revenues. Round-tripped revenues provide no economic substance, and is disqualified per ASC 606.

50.     These statements are false, misleading, and defamatory.  MPT does not engage in revenue round-tripping, and Viceroy has no "evidence" to "substantiate" its claim.  As discussed above, MPT's core business model for 20 years has been to underwrite healthcare real estate in accordance with well-tested criteria, and lease its properties to operators under terms and conditions that are designed to generate a steady rate of return on MPT's investment.  The commercial logic of this model—its ability to generate a profit—has been validated time and again, as have the protections that MPT has put in place to guard against tenant-operators' financial vulnerability.  MPT sometimes funds capital improvements as part of its acquisitions and developments, in which case the amount of the funding is built into the lease base.  There is no "round-tripping" of cash to operator-tenants, who in most cases—including most of the exemplar transactions Viceroy seizes upon but then misrepresents—are not even the recipients of the acquisition or development funds.  MPT's financial statements are subject to independent

financial audit every year, and the auditor has always issued an unqualified opinion.

51.     Indeed, the very transactions Viceroy cites as "evidence" for its claims prove the claims are false.  On February 1, 2023, for example, the day before posting its PwC letter, Viceroy published "MPW Case Study – Neuropsychiatric Hospitals," in which it claimed that MPT's commitment of $27.5 million to build a hospital near Houston, Texas was "completely unfathomable" because "the cost of development and market value of the land was combined [sic] total of $9.1m," meaning MPT had "overpaid for the [hospital] facility by 3x." Viceroy concluded its report by "reiterat[ing] our belief that MPW engages in pervasive revenue round-tripping schemes."

52.     These statements are false, misleading, and defamatory.  The very premise of a round-trip transaction—that the party to whom the funds flowed is the one returning them—is missing here, because virtually all of MPT's $27.5 million investment was paid *not* to the operator-tenant (NeuroPsychiatric Hospitals) but to the developer and former owner of the real estate (Medistar Gemini, LLC or "Medistar"), along with contractors, architects, suppliers, and other third parties. The fact that Medistar developed the facility is plain from the sources Viceroy displayed in its "report."  Viceroy therefore knew its round-tripping allegation was

false, or at the very least published that allegation with reckless disregard for its falsity.

53.     And Defendants' "overpayment" thesis rests on a deliberate or reckless distortion of conventional real estate valuation principles, which prescribe that the value of a leased property is based largely on the underlying cash flows of the lease—not on the cost of buying and developing the land.  In this case, MPT earns $2.3 million per year (plus an annual inflation adjustment) over a 20-year term—far outstripping the cost of acquisition and development.  This was an entirely commercial transaction.

54.     Viceroy levels the same "round-tripping" charge against many of MPT's major transactions going back several years, including:  MPT's 2016 and 2018 acquisition of Massachusetts hospitals from Steward, discussed above; MPT's 2017 acquisition with Steward of 11 hospitals owned by IASIS Healthcare Corporation; MPT's 2021 acquisition of 35 Priory Group Ltd. behavioral health facilities in the United Kingdom; and MPT's 2021 acquisition with Steward of five South Florida hospitals from Tenet Healthcare Corporation.  Not one of these transactions was "uncommercial" or involved "round-tripping" of revenue to operator-tenants.  In each case, as with the NeuroPsychiatric Hospitals transaction, the acquisition proceeds went to the seller of the real estate, whose identities MPT publicly disclosed.  In only one such case—the 2016 acquisition of Massachusetts

hospitals—was the seller (Steward, then controlled by Cerberus Capital Management, L.P.) also the operator, and in that case the proceeds were directed to a distribution to shareholders, retirement of existing debt, and payment of taxes and fees associated with the transaction.  As discussed above, moreover, the economics of the Massachusetts portfolio transaction were more than validated by the 2022 acquisition of the bulk of the portfolio by the Macquarie partnership, which—as was publicly disclosed—valued the portfolio at approximately $1.7 billion for eight of the nine hospitals MPT had acquired for approximately $1.3 billion in 2016 and 2018.  Viceroy's allegation of a "pervasive revenue round-robin scheme and / or theft" is fiction, disseminated with knowledge, or at least reckless disregard, of its falsity.

55.  **Allegations regarding executive compensation.**  In an attempt to support its defamatory "round-tripping" assertions, Viceroy also stated in its Twitter-published letter to PwC that MPT's executive compensation program "encourage[s] an aggressive, acquire-at-any-cost policy which ultimately aligns with a revenue round-tripping model."  In its January 26, 2023 report, Viceroy claimed that because "acquisitions" are a factor in the calculation of MPT's incentive compensation for its executives, management "has consistently scraped the bottom of the barrel in its search for new properties and new tenants."  "All these transactions will qualify executives for bonuses," Viceroy proclaimed.  In

conjunction with this report, Viceroy tweeted that the incentive compensation

formula was "aligned with fraud" and did not "disincentivize bad behavior":



56.     These statements are false, misleading, and defamatory.  Not all of

MPT's transactions "qualify executives for bonuses."  Instead, and as MPT has

repeatedly disclosed, after total acquisition value exceeds a certain threshold,

which management well surpassed in 2020 and 2021, executives receive *no*

incremental credit for new acquisitions under that metric.  The Company thus

executed billions of dollars of acquisitions that did not affect the "acquisitions"

component of the compensation formula at all.  That was plain to see in MPT's last

two annual proxy statements, both publicly on file with the SEC.

57.     Moreover, poorly performing acquisitions negatively affect other

compensation inputs, like funds from operations and total shareholder return.

Thus, MPT's executives would risk their own pay if they "consistently scraped the

bottom of the barrel" to "acquire at any cost."  MPT's proxy statements clearly

disclose the Company's use of these metrics.  They also show overwhelming

shareholder support for MPT's executive compensation program: over 92 percent

approval in each of the last five years.[20]  Viceroy knowingly or at least recklessly disregarded that information.

58.    **Allegations of concealment concerning Steward**.  As MPT has disclosed publicly for years, it has extensive dealings with operator-tenant Steward, the largest private physician-led healthcare network in the United States. In addition to leasing hospital properties to Steward, MPT has acquired a direct equity stake of just under 10 percent in Steward, and made loans to Steward that MPT believed created substantial upside potential for the Company and its investors.  Although MPT investors have benefited enormously from these dealings with Steward over the years, MPT has sought to diversify its portfolio and reduce its relative exposure to Steward, and has made that known to investors on earnings calls.

59.    Yet Defendants, in an effort to prop up their short attack, have accused MPT of lying about its connections to Steward.  In particular, they have released a series of reports claiming that MPT is deliberately concealing a secret ownership in certain Steward-connected hospitals in Malta.  These are falsehoods, ginned up to try to undercut investor and public confidence in MPT and harm the Company.

---

[20] Med. Props. Tr., Inc., Proxy Statement (Schedule 14A) 41 (Apr. 28, 2022).

60.     In 2020, MPT and members of Steward's management, including Steward CEO Ralph de la Torre, formed a joint venture called Manolete Health LLC to develop international opportunities.  MPT holds 49% of Manolete Health LLC, and Steward's management holds the other 51% through an investment vehicle that also has "Manolete" in its name.  Steward itself has no interest in the joint venture, which is between MPT and the individual Steward managers who formed the investment vehicle.

61.     To fund the venture, MPT made a $205 million loan to Manolete Health LLC, secured by Steward's management's equity in Steward.  Per multiple MPT securities filings since Q3 2020, Manolete Health LLC used the $205 million in part to purchase "the rights and existing assets related to all present and future international opportunities previously owned by Steward."

62.     Manolete Health LLC has acquired four Colombian hospitals.  It also made an unsecured loan of €1.1 million to an entity controlled by Steward's management—and in which neither MPT nor Manolete Health LLC holds an interest—to facilitate the purchase by *that* entity of Steward Health Care International ("SHCI").  SHCI, in turn, owns hospital concessions in Malta. Although MPT and Manolete Health LLC have considered investing in Malta hospitals and other properties, they have not done so.  Neither entity has an ownership interest in SHCI's Malta hospital concessions.

63.     Defendants have made numerous false, misleading, and defamatory statements about this joint venture.  In its January 26 report, Viceroy claimed that MPT "paid $205m for 3 hospitals worth $27m in Malta" that were purportedly "under investigation for corruption":



64.     These statements are false, misleading, and defamatory.  Steward did not get a "windfall" of $205 million from MPT; it received payment, through Manolete Health LLC, for what had been its rights and existing assets related to international opportunities.  This was fully disclosed contemporaneously.  Nor did MPT get any hospitals in Malta.

65.     Viceroy has repeated and embellished the Malta falsehood, with four reports dedicated to it:  "MPW Case Study – Steward International," published February 8, 2023; "MPW Case Study – Steward International Pt. 2," published February 13, 2023; "MPW Case Study – Steward International Pt. 3," published February 17, 2023; and "MPW & SHCI – A Den of Thieves," published March 3, 2023.  In the February 8 report and accompanying tweets, Viceroy even invented

an organizational chart that showed MPT as an owner of "Steward Malta" and

made various accusations of fraud:



66.     On February 24, Viceroy tweeted:  "BREAKING: The Malta Courts

have annuled [sic] Steward Health Care International's Malta Hospital concession.

Steward International is an $MPW subsidiary.  Judge claims Steward International

committed fraud."  The same day, Perring retweeted Viceroy's post and added:

"As $MPW's crooked subsidiary tried to hide its links with @Steward (US) &

#MPW, expect arrests.  If the Bond Market thinks these assets are fully backed

after the #RoundTripping & #Fraud, they've got another thing coming."

67.     In its March 3 report—another report dedicated to spreading

falsehoods related to Steward and Malta—Viceroy wrote:  "Throughout our

investigation into SHCI, it has maintained that it has no relationships and is not owned by MPW or SHCS.  This is the biggest lie of all."  Viceroy cited as evidence that "MPW is written into SHCI subsidiary by-laws as a member of the Manolete group on entities.  Texas local franchise filings show MPW is a shareholder of Manolete.  MPW has a subsidiary listed in its annual report with the Manolete name."

68.     On March 17, in its latest report, Viceroy continued to falsely associate MPT with Malta, writing:  "MPW has not marked down its investment in its Maltese international joint venture with Steward despite multiple public issues around this concession.  Recently a Maltese court has revoked the joint venture's concession and ordered the hospitals returned to the state and opined that Steward Health Care International fraudulently obtained the concession."

69.     These statements are all false, misleading, and defamatory.  As set forth above, and as SHCI stated publicly over a year ago on February 1, 2022, MPT has no ownership of or interest in SHCI.  Neither Manolete Health LLC nor MPT has any ownership interest in any Malta property or hospital.  To make it appear otherwise, and to make it appear as though MPT has lied to investors, Defendants have deliberately conflated Manolete Health LLC with other entities that MPT does not own.

70.     **Accusations of scamming and fraud, and encouragement of criminal investigations.**   As part of their campaign to artificially depress MPT's stock price, Defendants have coupled their targeted false statements with extravagant accusations of criminal wrongdoing.

71.     Perring, for example, has used Twitter to post a steady barrage of aggrandizing statements about purported wrongdoing by MPT to his tens of thousands of followers on the platform.   For example:

- January 26, 2023:  "$MPW is a fraud."

- February 4, 2023:  "#MPW is verging on the largest US #Healthcare #fraud."

- February 13, 2023:  "What a #Fraudulent piece of _ _ _ _ $MPW @steward are."

- February 13, 2023:  "[T]his fraud is a massive #RoundTripping #Scam & rotten to the core."

- February 15, 2023:  "$MPW, if they tell you the day check your calendar. #Misstatements, #Fraud, #Roundtripping & #Corruption."

- February 15, 2023:  "When will investors realise? We have far from finished with $MPW. Remember these words, its [sic] a #ponzi scheme reliant on #RoundTripping, insane #AFFO, with @Steward & #MPW are

part of an international corruption investigation. #Fraud everywhere...to quote one great man, #ItsAScam."

- <u>February 19, 2023</u>:  "$MPW's problems are the shady deals, #Fraud, & involvement in #Corruption while scamming investors with #RoundTripping via @Steward for yrs. With so many investigations going on mgmt must hate knocks at the door."

- <u>February 22, 2023</u>:   "$MPW is a #RoundTripping #Fraud & #Steward are bust!"

- <u>February 27, 2023</u>:  "$MPW & @Steward are complete #frauds."

- <u>February 28, 2023</u>:  "These are bad actors, with fraudulent & deceitful operations."

- <u>February 28, 2023</u>:  "When #MPW's mgmt mouths' are moving the odds are they're lying. #Fraud."

72.    Perring has coupled these attacks with repeated promises that MPT executives and employees are headed to prison for "fraud."  For example, on February 1, 2023, Perring tweeted:  "[M]ake no mistake there will be charges here. Its [sic] #Fraud."  On February 27, 2023, Perring tweeted:  "#ItsComing - Class Action Lawyers smell the blood. People are going to prison who are involved eith [sic] $MPW & @Steward. #RoundTripping & #Fraud.  #MPW."  On March 4, 2023, Perring shared screenshots of a conversation with an anonymous purported

whistleblower referring to alleged evidence of "pure genius enron styled fraud." When questioned two weeks later by a Twitter user about why this supposed evidence had not been released, Perring deflected:  The documents were under review, he assured the user, and "$MPW[] [is] where money goes to die & employees will go to prison."

73.     All of these statements are false, misleading, and defamatory.  A reasonable reader would understand Perring's assertions to be statements of fact about MPT's business and management.  MPT is not a "[s]cam," "ponzi scheme," or "fraud."  It is not "part of an international corruption investigation."  It is not engaged in "round tripping."  But because accusing MPT of dishonesty and corruption, and prejudicing MPT's business, is in Defendants' financial interest, Defendants have slung this defamatory invective anyway.

74.     **Viceroy's attempts to disclaim liability.**  Viceroy has attempted to evade liability for its defamatory falsehoods by inserting a blanket disclaimer in each of its reports—sometimes in the middle, sometimes at the end.  Viceroy claims, among other things, that its "report has been prepared for educational purposes only and expresses our opinions," and that nothing in the report should be construed "as an opinion on the merits or otherwise of any particular investment or investment strategy."  A similar disclaimer appears on the landing page of Viceroy's website, viceroyresearch.org.  At various points throughout its reports,

Viceroy similarly tries to couch its slanderous falsehoods as opinions by using qualifiers like "believe" and "appear."

75.   The disclaimers are contradicted, however, by Viceroy's boast that its "mission is to sift fact from fiction," which appeared in its January 26, 2023 report:

> **About Viceroy**
>
> Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

76.   More fundamentally, the false, misleading, and defamatory statements identified in this Complaint are not "opinions" or "beliefs" but rather statements of purported fact, whose fundamental character cannot be altered by disclaimers.

### E.   Defendants' conspiracy with others

77.   Defendants have not operated alone in past short-and-distort campaigns.  Nor have they here:  They have joined forces with others who share their economic interest in trashing MPT.

78.   Among those conspiring with Defendants to drive down MPT's stock price is another supposed financial research firm that began bashing MPT even before Viceroy came on the scene.  This firm generates revenue from subscriptions, and has acknowledged publicly that its continued profitability turns on whether its predictions about particular stocks pan out.

79.     Defendants and the agents of this co-conspirator firm have parroted one another's language and accusations about MPT, retweeting each other's messages with accompanying words of support, replying within threads, and tagging one another in posts.  Both have accused MPT and its executives of fraud and artificial boosting of executive compensation, and both have even perpetuated false statements about MPT's supposed ownership of Malta hospitals.

80.     In addition to this mutual cooperation with a co-conspirator research firm, Defendants have frequently engaged with other users on Twitter, replying to their comments and even tagging repeat players who share the same interest in baselessly attacking MPT.  Defendants' Twitter feeds evince a sustained and coordinated effort by parties with a mutual financial interest to amplify and legitimize one another through re-tweets, replies, and tags.

**F.     Conduct directed at Alabama**

81.     MPT is headquartered in Birmingham, Alabama, and its executives and employees live and work primarily in Alabama.  Defendants' false and defamatory accusations of fraud and other misdeeds therefore concern MPT's Alabama activities and impugn the honesty and commercial reputation of an Alabama-based company.

82.     Defendants knew that MPT was headquartered in Alabama when they defamed MPT, and therefore could have reasonably expected that MPT would

suffer the effects of their defamatory falsehoods in Alabama. MPT discloses its principal place of business in public securities filings, including its annual Form 10-K, which Defendants repeatedly have cited. And Defendants have admitted they know where MPT is principally located. For example, on January 27, 2023, Viceroy tweeted: "In 2003 HealthSouth executives admitted their involvement in similar accounting #fraud to Medical Properties Trust. Like $MPW they were based in Birmingham Alabama. It ended badly with prison time."

83. Defendants and their co-conspirators have made additional, even more direct and purposeful, contacts with Alabama. Viceroy's defamatory February 2, 2023 letter to PwC, which it posted on Twitter, was addressed to PwC's Birmingham, Alabama office, and in particular to a partner at that firm who resides and works in Alabama. And on February 13 and 14, 2023, a co-conspirator traveled to Alabama for an in-person "diligence" trip concerning MPT.

### G. The significant harm directed at and caused to MPT

84. In the course of smearing MPT for financial gain, Defendants have, at various points, accused MPT of lying to investors, orchestrating international corporate kickback schemes, and generally running a sham business. Defendants have loudly and repeatedly proclaimed that MPT's executives, whom Defendants do not hesitate to name, should be sent to prison for these purported misdeeds.

Unfortunately, lies that are repeated often enough can begin in some people's minds to resemble the truth.  This has caused concrete and ongoing harm to MPT.

85.    Defendants' defamation has damaged MPT's reputation with potential commercial counterparties.  Earlier this month, for example, Steward sought to broker a deal with University Health System, in Bexar County, Texas, involving a hospital owned by MPT.  University Health pulled away from the deal, citing one of Viceroy's reports and stating publicly that "our mission and values are not aligned with Medical Properties Trust."[21]  A senior public official involved in the deal added that there was "a moral obligation to not do business with entities who have shady financial practices."[22]  Such refusal to do business with MPT and Steward, MPT's tenant, was a direct and proximate result of Defendants' defamation.

86.    In response, Bernarde, seeing the effects of his defamation in action, did not pass up the opportunity to pile on, tweeting, "Lmfao $MPT @Steward_Int."

---

[21] Madison Iszler, *Gloves off in public battle over who's responsible for future of South Side San Antonio hospital*, San Antonio Express-News (Mar. 6, 2023 7:39 PM), https://www.expressnews.com/business/local/article/texas-vista-med-center-future-university-health-17823230.php.
[22] Madison Iszler, *University Health won't step in to save Texas Vista hospital; it's working to place its patients.*, San Antonio Express-News (Mar. 8, 2023 11:54 AM), https://www.expressnews.com/business/local/article/university-health-texas-vista-medical-center-17825919.php.

87.    On information and belief, Defendants' campaign of defamation has generated unprecedented negativity from credit rating agencies and bondholders. MPT personnel have spent significant time responding to rating agencies' questions about Defendants' reports.  Amid Defendants' constant stream of defamatory accusations, S&P Global Ratings downgraded MPT's issuer credit rating from BB+ to BB, a change that increased MPT's cost of borrowing money and may drive away investors.  Defendants' falsehoods have similarly generated uncertainty among MPT's bondholders.  One such holder had requested a single meeting in the 20 years before Viceroy came on the scene—and then three meetings in the months after Defendants began flooding the market with defamatory and malicious statements.  While MPT welcomes good-faith scrutiny from, and dialogue with, its stakeholders, Defendants' falsehoods have required MPT to divert substantial resources that would otherwise have been used to advance its business.

88.    Defendants' defamation has also damaged, and continues to damage, MPT's relationship with its shareholders.  In a recent report, the market research firm Green Street noted that Viceroy "ha[d] contributed to the sell-off in [MPT's] share price."  It went on to parrot some of Viceroy's false claims, confirming that Defendants' coordinated defamation campaign is working exactly as intended, to MPT's and its investors' detriment.

89.     In addition to defaming MPT as a company, Defendants have also attacked MPT's executives personally.  In particular, Defendants have published disparaging remarks about CEO Ed Aldag in an attempt to damage his reputation. On February 13, 2023, for example, Perring tweeted that "#Fraud & #RoundTripping are the soup du jour for #Aldag & #RDLT," and on March 3, 2023, Perring tweeted that he will "order $MPW when #Aldag gets arrested for $MPW."  Defendants' conduct has encouraged anonymous Twitter users to dox MPT's employees and generated a stressful workplace environment.  MPT has had to incur costs to retain employees and increase physical security at its Birmingham headquarters because of Defendants' actions.

90.     Perring has stated that MPT's stock is worthless.  That is false, but it is Defendants' objective to *make* MPT's stock worthless, and to line their pockets in the process.  Defendants' campaign to defame MPT and drive down MPT's stock price is ongoing, and Defendants have offered no indication that they plan to let up.  Absent swift and permanent injunctive relief, MPT will continue to be irreparably harmed by Defendants' self-interested disregard for the truth.

## CLAIMS FOR RELIEF

### COUNT ONE
### Defamation – Libel
### (Against All Defendants)

91.     The allegations of paragraphs 1 through 90 are repeated as if fully set forth herein.

92.     Defendants authored the written statements attributed to them in paragraphs 1 through 90 (the "Libelous Statements").

93.     Each of the Libelous Statements concerns MPT.

94.     Defendants published the Libelous Statements to third parties.  Such publication occurred on Twitter and on Viceroy's website, viceroyresearch.org.

95.     The Libelous Statements are statements of fact, not opinion, that were made without full and complete disclosure of their underlying factual bases.  The Libelous Statements therefore were reasonably capable of a defamatory meaning and did in fact carry a defamatory meaning.

96.     Defendants made each of the Libelous Statements with knowledge that they were false, or at least with reckless disregard of whether they were false or not.

97.     The Libelous Statements are defamatory and libelous *per se* because they impute dishonesty or corruption to MPT and directly tend to prejudice MPT in its trade or business.

98.     MPT has suffered damages as a direct and proximate result of Defendants' Libelous Statements, and is entitled to an award of compensatory damages in an amount to be proven at trial.

99.     As a result of Defendants' Libelous Statements, MPT has suffered and will continue to suffer irreparable harm.  MPT is therefore entitled to injunctive relief.

**COUNT TWO**
**Civil Conspiracy**
**(Against All Defendants)**

100.    The allegations of paragraphs 1 through 99 are repeated as if fully set forth herein.

101.    From at least on or about January 26, 2023 to the present, Viceroy, Perring, Bernarde, and Lau engaged in concerted action with one another and with third persons, including an investment research firm and its agents, to promote and amplify false and defamatory statements about MPT, including the Libelous Statements.

102.    Defendants also engaged in concerted action to promote and amplify each other's false and defamatory statements about MPT for the purposes of imputing dishonesty or corruption to MPT and of prejudicing MPT in its trade or business.

103.   As a result of Defendants' concerted action with one another and with others, Defendants are jointly and severally liable to MPT for damages in an amount to be proven at trial.

## COUNT THREE
### Tortious Interference With Contractual or Business Relations
### (Against All Defendants)

104.   The allegations of paragraphs 1 through 103 are repeated as if fully set forth herein.

105.   MPT has protectable business relationships with employees, shareholders, bondholders, and prospective operator-tenants.  Defendants, who have written extensively about MPT, are aware of such relationships.

106.   Defendants are strangers to all such relationships.  As short-sellers, Defendants have borrowed and sold MPT's stock and therefore do not own a direct beneficial and/or economic interest in MPT.

107.   Defendants intentionally interfered with MPT's business relationships with employees, shareholders, bondholders, and potential operator-tenants by publishing defamatory falsehoods that impugned the integrity of named employees, cast doubt on MPT's creditworthiness, and accused MPT of unethical and criminal behavior.

108.   As a result of Defendants' tortious interference, MPT has suffered damages in an amount to be proven at trial.

## COUNT FOUR
### Private Nuisance (Ala. Code §§ 6-5-120, 6-5-121)
### (Against All Defendants)

109.   The allegations of paragraphs 1 through 108 are repeated as if fully set forth herein.

110.   Defendants' coordinated campaign of defamation for their own financial gain constitutes a nuisance which has caused significant economic harm to MPT:  It has reduced MPT's stock price, interfered with MPT's relationships with shareholders and bondholders, cost valuable executive time, injured MPT's reputation, and caused MPT to take special financial measures to retain employees. Further, Defendants' persistent threats against MPT's executives and employees have necessitated an increase in security measures, substantially interfering with MPT's reasonable use and enjoyment of its corporate headquarters.

111.   Defendants' interference with MPT's use and enjoyment of its property was substantial, and was, by all accounts, offensive, inconvenient, and unreasonable.

112.   It was eminently foreseeable to Defendants that their actions would impose such harms on MPT and, hence, Defendants owed MPT a duty of care which they then breached.  Defendants' defamatory statements, moreover, directly and proximately caused hurt, inconvenience, and damage to MPT.

113.    Defendants published their respective defamatory statements with knowledge of their falsity, or at least reckless disregard for their truth.  Defendants have disseminated falsehoods about MPT in a constant, coordinated fashion and for the purpose of driving MPT's stock price down and reaping a substantial profit. Thus, Defendants' conduct is wanton, malicious, and attended by circumstances of aggravation.

114.    As a result of the nuisance created by Defendants, MPT is entitled to injunctive relief, as well as compensatory and punitive damages in an amount to be proven at trial.

## COUNT FIVE
### Unjust Enrichment
### (Against All Defendants)

115.    The allegations of paragraphs 1 through 114 are repeated as if fully set forth herein.

116.    On information and belief, Defendants have profited from the decline in MPT's stock price.  They have obtained profits from their short position in MPT and other financial benefits.  Defendants knowingly accepted and retained these benefits.

117.    These benefits resulted from Defendants' wanton, malicious, and coordinated campaign to defame MPT and manipulate its stock price downward. Such conduct is inequitable and unconscionable.

118.   The benefits Defendants received were at MPT's expense. Defendants have benefited from the reduction they caused in MPT's enterprise value and the expenditures of time and resources MPT has undertaken in response to Defendants' unconscionable conduct.  Defendants also have benefited at the expense of MPT's shareholders.

119.   MPT reasonably expects that Defendants will compensate MPT for the benefits Defendants have received unjustly and without MPT's consent.  It would be inequitable to allow Defendants to retain their ill-gotten gains, borne of their malicious and illicit short-and-distort scheme.

120.   Therefore, MPT is entitled to an order requiring Defendants to disgorge the benefits by which Defendants were unjustly enriched.  Alternatively, a constructive trust should be imposed upon those benefits, to be forfeited and disposed of pursuant to the Court's instructions.

## PRAYER FOR RELIEF

WHEREFORE, MPT respectfully prays this Court enter an Order:

    a.   Awarding compensatory damages in an amount to be determined at trial;

    b.   Awarding punitive damages in an amount sufficient to punish Defendants for their wrongful conduct and to deter others from committing similar wrongs;

c.  Ordering Defendants to disgorge the benefits by which they were unjustly enriched and/or imposing a constructive trust upon such benefits;

d.  Ordering Defendants to immediately remove all defamatory statements concerning MPT from their social media accounts and website;

e.  Permanently enjoining Defendants' repetition of any defamatory statements concerning MPT;

f.  Awarding MPT its attorneys' fees and costs from prosecuting this action;

g.  Awarding prejudgment interest under Ala. Code § 8-8-10; and

h.  Granting MPT such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 30, 2023

LIGHTFOOT, FRANKLIN & WHITE LLC

OF COUNSEL:

William Savitt (*pro hac vice* to be filed) /s/Michael L. Bell
Sarah K. Eddy (*pro hac vice* to be filed) Michael L. Bell
Nathaniel Cullerton (*pro hac vice* to be filed) Wesley B. Gilchrist
Adabelle U. Ekechukwu (*pro hac vice* to be filed) The Clark Building
Sijin Choi (*pro hac vice* to be filed) 400 20th Street North
Charles M. Melman (*pro hac vice* to be filed) Birmingham, Alabama 35203
WACHTELL, LIPTON, Tel.: (205) 581-0700
ROSEN & KATZ
51 West 52nd Street *Attorneys for Plaintiff*
New York, NY 10019
Tel.: (212) 403-1000

Corey Worcester (*pro hac vice* to be filed)
Jomaire A. Crawford (*pro hac vice* to be filed)
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
Tel.: (212) 849-7000

Anthony Bongiorno (*pro hac vice* to be filed)
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel.: (617) 712-7100

DEFENDANTS TO BE SERVED AT THE FOLLOWING ADDRESSES:

Viceroy Research LLC
1201 Orange Street, Suite 600
Wilmington, DE 19801

Fraser John Perring
28 Robins Crescent
Witham St Hughs
United Kingdom LN6 9UU

Gabriel Bernarde
11 Eckersley Court
Blackburn South
Victoria
Australia 3130

Aidan Lau
Unit 205/750 Station Street
Box Hill
Australia 3128