FILED
2023 Jun-29  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MEDICAL PROPERTIES TRUST, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:23-cv-00408-RDP** |
| | } | |
| **VICEROY RESEARCH, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

### I.      Introduction

This action is before the court on Defendants Viceroy Research ("Viceroy") and Fraser Perring's 12(b)(2) Motion to Dismiss (Doc. # 16) and Defendant Viceroy's 12(b)(6) Motion to Dismiss. (Doc. # 17). Defendants' Motions have been fully briefed (Docs. # 16, 34, 40 and 17, 33, 39, respectively) and are ripe for review. After careful review, and for the reasons discussed below, Defendants' 12(b)(2) Motion (Doc. # 16) is due to be denied, and Viceroy's 12(b)(6) Motion (Doc. # 17) is due to be granted in part and denied in part.

### II.      Background

This case arises out of Defendants Viceroy, Perring, Gabriel Bernarde, and Aidan Lau's (collectively "Defendants" or  "Individual Defendants" when referencing Perring, Bernarde, and Lau) alleged efforts to manipulate Plaintiff Medical Properties Trust's ("Plaintiff" or "MPT") stock price in order to profit on its short position. On March 30, 2023, Plaintiff filed this action alleging defamation and other state law claims

A.      **MPT's Business Practices**

Plaintiff MPT is a real estate investment trust ("REIT") that acquires, develops, and invests in healthcare facilities. (Doc. # 1 ¶ 10). MPT has long been one of Alabama's largest and most prominent publicly traded companies, and its largest REIT. (*Id.* ¶ 1). MPT acquires and develops healthcare facilities to lease out to operating companies under long-term net leases, which require tenants to bear most of the costs associated with the properties. (*Id.* ¶ 20). A typical lease provides for a term of at least 15 years with a series of short renewal options. (*Id.* ¶ 22). MPT's business model is centered around steady, long-term returns for its investors. (*Id.* ¶ 24). To that end, MPT underwrites real estate investments that are attractive to hospital operators, so that if one operator must break its lease, a replacement operator will soon assume the lease. (*Id.*).

> Among the characteristics MPT looks for in evaluating hospital real estate are: (1) good physical quality reflecting a history of maintenance and improvements; (2) location in a strong market, with measurable patient demand growth, sustainable reimbursement sources, and features that attract a dedicated workforce; (3) a geographic environment in which the operator is likely to hold a strong competitive position; and (4) facility-level operations with strong EBITDARM (earnings before interest, taxes, depreciation, amortization, rent, and management fees) coverage of lease payments.

(*Id.*). MPT reasons that a medical facility meeting these criteria is likely to reflect a true "community need," meaning its success is not dependent on a given operator. (*Id.*).

For example, in 2016 and 2018, MPT purchased nine Massachusetts hospitals from hospital operator Steward Health Care System for approximately $1.3 billion. (*Id.* ¶ 25). In 2022, private equity firm Macquarie Asset Management entered into a joint venture with MPT for eight of those Massachusetts hospitals, which had a total valuation of about $1.7 billion, an increase in value over the purchase price of some $400 million. In the interim, those hospitals had yielded about $475 million in income for MPT. (*Id.*). This is MPT's bread and butter: invest in an attractive facility, generate income from that facility, then sell the facility for a profit.

MPT currently has investments in 444 facilities, the vast majority of which are leased to 55 tenants. (*Id.* ¶ 26). Its revenues exceeded $1.5 billion in 2022, making it "one of the largest REITS in the healthcare sector and among the largest publicly traded companies in Alabama, where the majority of its employees are located." (*Id.*). MPT has retained PricewaterhouseCoopers ("PwC") as its independent auditor since 2008. (*Id.* ¶ 28). Every year since 2008, "PwC has issued an unqualified opinion that MPT's financial statements 'present fairly, in all material respects, the financial position of' the Company and 'the results of its operations and its cash flows' for the relevant periods in conformity with generally accepted accounting principles." (*Id.* ¶ 29).

**B.      Short-Selling and Short-and-Distort Campaigns**

Taking a short position involves a bet that a stock's price will fall. A trader takes a short position by "sell[ing] a security first with the intention of repurchasing … later at a lower price." James Chen, *Short Position: Meaning, Overview, and FAQs*, Investopedia (Sept. 12, 2022) https://www.investopedia.com/terms/s/short.asp. Because a stock's price can never fall below $0, the short-seller's potential profit is capped. But, because there is no limit to how high a stock price may rise, short sellers "face unlimited downside risk." (*See id.*).

Because the risk inherent in short selling is so high, some short sellers engage in "short-and-distort" campaigns. (Doc. # 1 ¶ 31). That is, they "publish[] … or otherwise promoting false and misleading information about the companies they bet against." (*Id.*). Doing so allows short sellers to "drive down those companies' stock prices and generate profit for themselves." (*Id.*). The Securities and Exchange Commission has recently proposed a rule designed in part to combat these illegal short-and-distort campaigns. 87 F.R. 14950, 14991-94 (Mar. 16, 2022) ("[I]f short and distort type behavior were to be suspected, then the Commission would be more likely to

identify individuals with large short positions and could thus quickly focus any inquiries on entities in an economic position to potentially profit from manipulation.").

### C.    Viceroy and the Individual Defendants' Accusations Against MPT

Defendant Viceroy is a financial research firm founded by Fraser Perring, a citizen of the United Kingdom, along with Gabriel Bernarde and Aidan Lau, both Australian citizens. (*Id*. ¶ 11). On January 26, 2023, Viceroy published a report titled "Medical Properties (dis)Trust," in which it noted that it had a short position in MPT. (Doc. # 1 ¶ 41). That same day, Viceroy and the Individual Defendants began using their Twitter accounts to promote their report and otherwise criticize MPT. (*Id*. ¶ 42). Defendants went on to publish 13 more reports on MPT, purportedly consisting of research on MPT's business practices. (*Id*.). In each of these reports, and in a February 2, 2023 letter Defendants published to Twitter, Viceroy claims to have analyzed and found wanting "the accounting treatment MPT has applied in its financial statements." (*Id*. ¶ 43). MPT identifies four categories of **misrepresentations** that it asserts subject Defendants to liability: (1) false accusations of "round-tripping;" (2) false characterizations of MPT's executive compensation formula; (3) false accusations of lying about dealings with operator-tenant Steward; and (4) false accusations of fraud and criminal activity. (*Id*. ¶ 45).

#### 1.    Round-Tripping

Round-tripping occurs when a party transacts with a counterparty to provide funds with the understanding that the counterparty will later return those funds in a second transaction. (*Id*. ¶ 46). The original party then records the returned funds as revenue. (*Id*.). For example, A agrees to sell B a pencil for $1. At the outset, both parties agree that A will later purchase the same pencil from B for the same price at which A sold it. When A re-purchases the pencil from B, B records a $1 revenue infusion despite no additional revenue going into its coffers.

Plaintiff provides several examples of Defendants accusing it of round-tripping. (*Id*. at ¶¶ 47-54). Among these allegedly "false, misleading, and defamatory" statements were accusations that: (1) MPT's rent was round tripped by fake purchases of massively inflated assets; (2) MPT has engaged in billions of dollars of uncommercial sale-leaseback transactions; (3) MPT appeared to constantly overpay for fire sale assets by as much as 10x, "which in turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term;" and (4) MPT paid $27.5 million to build a hospital near Houston, Texas despite the total cost of development and market value being only $9.1 million. (*Id*.).

## 2. Executive Compensation

Viceroy also claimed that MPT executives profited under an executive compensation program that "encourage[d] an aggressive, acquire-at-any-cost policy which ultimately align[ed] with a revenue round-tripping model." (*Id*. ¶ 55). Viceroy further claimed that, because acquisitions were a factor in its calculation, this compensation structure led MPT management to "consistently scrape[] the bottom of the barrel in its search for new properties and new tenants." (*Id*.). MPT alleges that these statements are false, misleading, and defamatory because (1) after total acquisition value reaches a certain threshold (which was well surpassed in 2020 and 2021), executives receive no credit per new acquisition; and (2) poorly performing acquisitions negatively affect other compensation inputs. (*Id*. ¶ 56-57). So, any conceivable advantage an executive might receive from blindly acquiring unprofitable properties is negated by the harm such a strategy would do to the executive's bottom line.

## 3. Allegations of Concealment

MPT maintains an extensive business relationship with operator-tenant Steward Healthcare Systems, the largest private physician-led healthcare network in the United States. (*Id*. ¶ 58). MPT

also has a direct equity stake in Steward of just under 10% and has made loans to Stewart that MPT deemed beneficial. (*Id.*). Despite past success in its dealings with Steward, MPT informed its investors on earnings calls that it has sought to diversify its portfolio and reduce its relative exposure to Steward. (*Id.*).

One of Viceroy's lines of attack on MPT concerned MPT's relationship with Steward. Viceroy allegedly released a series of reports claiming that MPT is "deliberately concealing a secret ownership in certain Steward-connected hospitals in Malta." (*Id.* ¶ 59). Specifically, Viceroy (1) claimed that MPT "paid $205m for 3 hospitals worth $27m in Malta that were purportedly under investigation for corruption" (*Id.* ¶ 63) (internal quotations omitted); (2) published an organizational chart that showed MPT as an owner of "Steward Malta" (*Id.* ¶ 65); and (3) repeatedly accused MPT of fraudulently concealing its investment in Maltese hospitals. (*Id.* ¶¶ 66-69). MPT denies any direct investment in Maltese hospitals.[1]

### 4.     Public Accusations of Fraud

In addition to the allegedly defamatory statements included in Viceroy's reports, Viceroy and the Individual Defendants have taken to social media to accuse MPT of fraud and other criminal wrongdoing. For example, throughout February 2023, Defendant Perring tweeted separately that: (1) MPT "is verging on the largest US #Healthcare #fraud;" (2) MPT and Steward are "#Fraudulent piece[s] of [expletive];" (3) MPT is a "#ponzi scheme reliant on #RoundTripping, insane #AFFO, with @Steward & #MPW are part of an international corruption investigation. #Fraud everywhere…to quote one great man, #ItsAScam;" (4) MPT and Steward are "bad actors, with fraudulent and deceitful operations." (*Id.* ¶ 71). Perring also repeatedly assured his Twitter

---

[1] In its Complaint, MPT outlines its relationship to the hospitals in Malta in detail. (Doc. # 13 ¶¶ 60-62). But, it is unnecessary for the court to address the description of that relationship here.

followers that MPT executives would soon be criminally charged and imprisoned for their wrongdoing, and that MPT would soon be mired in class action lawsuits. (*Id*. ¶ 72).

###    D.    Viceroy's Disclaimers

In each of its reports on MPT, Viceroy included a blanket disclaimer that the report "has been prepared for educational purposes only and expresses [Viceroy's] opinion," and that no information in the report should be construed as "an opinion on the merits or otherwise of any particular investment or investment strategy."(*Id*. ¶ 74). For its part, MPT alleges that "the false, misleading, and defamatory statements identified in [its] Complaint are not 'opinions' or 'beliefs' but rather statements of purported fact, whose fundamental character cannot be altered by disclaimers." (*Id*. ¶ 76).

###    E.    Other Allegations

####       1.    Conspiracy

In addition to its defamation claims, MPT alleges that Viceroy has conspired with another financial research firm who shares an interest in driving MPT's stock price down. That firm, unnamed in the Complaint, generates revenue from subscriptions and benefits when its predictions about particular stocks pan out. (*Id*. ¶ 78). To that end, agents of the conspirator firm have allegedly amplified Viceroy's attacks on MPT and engaged in similar attacks on social media in an effort to harm MPT. (*Id*. ¶ 79-80).

####       2.    Conduct Directed at Alabama

MPT claims that Viceroy knew MPT was headquartered in Birmingham, Alabama, and that its executives and employees primarily lived and worked in Birmingham when it began these allegedly defamatory attacks. (*Id*. ¶ 81-82). As a result, MPT contends that Viceroy could have reasonably expected that MPT "would suffer the effects of [Viceroy's] defamatory falsehoods in

Alabama." (*Id*. ¶ 82). Indeed, not only did MPT repeatedly disclose its principal place of business in public securities filings, but Viceroy acknowledged that it knew MPT was located in Birmingham. (*Id*.). In January 2023, Viceroy tweeted: "[i]n 2003 HealthSouth executives admitted their involvement in similar accounting #fraud to [MPT]. Like [MPT] they were based in Birmingham, Alabama." (*Id*.). Additionally, the February 2, 2023 letter Viceroy posted to Twitter was addressed to a partner in PwC's Birmingham office. (*Id*. ¶ 83). Finally on February 13 and 14, 2023, Plaintiff alleges that a conspirator travelled to Alabama to conduct diligence concerning MPT. (*Id*.).

### 3.      Concrete and Ongoing Harm to MPT

In March 2023, Steward sought to broker a deal with a Texas health system involving an MPT-owned hospital. (*Id*. ¶ 85). But, the health system backed out of the deal, citing a Viceroy report and publicly stating that its "mission and values are not aligned with Medical Properties Trust." (*Id*.). Further, S&P Global Ratings downgraded MPT's issuer credit rating, which raised MPT's cost of borrowing money. (*Id*. ¶ 87). MPT also believes that Viceroy's actions have strained its relationship with bondholders. (*Id*.). MPT points to a report by market research firm Green Street in which it notes that Viceroy "contributed to the sell-off in [MPT's] share price." (*Id*. ¶ 88) (alterations in original). Finally, in its pleadings, MPT details the cost it has been forced to incur to retain employees and increase security at its Birmingham headquarters in response to Defendants' attacks on MPT and its executives. (*Id*. ¶ 89).

## III.      Legal Standards

### A.      Rule 12(b)(2) Motion to Dismiss

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking the exercise of personal jurisdiction over a

nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction.").

"A federal district court in [Alabama] may exercise personal jurisdiction over a nonresident defendant to the same extent that [an Alabama state] court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008); *see* Ala. R. Civ. P. 4.2. The Supreme Court recognizes two types of personal jurisdiction that are consistent with these requirements: general jurisdiction and specific jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-24 (2011). Only the court's exercise of specific jurisdiction is at issue here.

The court applies a two-part analysis in determining whether there is specific personal jurisdiction over a nonresident defendant. *See Cable/Home Cmmc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); *see also Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989). First, the court considers the jurisdictional question under the state long-arm statute. *See Cable/Home Commc'n Corp.*, 902 F.2d at 855; *see also Alexander Proudfoot Co.*, 877 F.2d at 919. If there is a basis for asserting personal jurisdiction under the state statute, the next question is whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *Cable/Home Commc'n Corp.*, 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919. A federal court may

exercise personal jurisdiction over a nonresident defendant only if both prongs of the analysis are satisfied.

Federal courts are required to construe the Alabama long-arm statute the same way the Supreme Court of Alabama would. *See Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890-91 (11th Cir. 1983). Alabama's long-arm statute permits personal jurisdiction to the extent it "is not inconsistent with the [Alabama Constitution] or the Constitution of the United States." Ala. R. Civ. P. 4.2(b). Thus, the question here is whether assertion of personal jurisdiction over Defendants comports with the Fourteenth Amendment's Due Process Clause. *See Olivier v. Merritt Dredging Co.*, 979 F.2d 827 (11th Cir. 1992) (citing *Alabama Waterproofing Co., Inc. v. Hanby*, 431 So. 2d 141, 145 (Ala. 1983)).

The requirements of the Fourteenth Amendment's Due Process Clause are met where (1) the defendant has minimum contacts with the forum state, and (2) the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." *Olivier*, 979 F.2d at 830-31; *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (quoting *International Shoe*, 326 U.S. at 316). A defendant has established minimum contacts with the forum state when he has "'purposefully availed' himself of the benefits of conducting activities in the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (cleaned up); *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).

A defendant purposefully avails itself of the privileges of conducting activities in a state "where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). "Thus[,] where the defendant deliberately has

engaged in significant activities within a State … or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Id.* at 475-76 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984); *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648 (1950)).

As the Supreme Court has consistently held, the mere foreseeability of causing injury in another state is not a "sufficient benchmark" for exercising personal jurisdiction. *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Rather, to be subject to the court's in personam jurisdiction, a defendants' "conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *Volkswagen*, 444 U.S. at 297). In determining whether a defendant should have reasonably anticipated litigation in the forum, the Court has held that it is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added).

Alternatively, a plaintiff harmed by an intentional tort may be afforded the opportunity to seek redress where the harm was felt even if the defendant has not otherwise purposefully availed itself of that forum. *Calder v. Jones*, 465 U.S. 783, 790 (1984) ("[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."). The *Calder* effects test requires a showing that the defendant (1) committed an intentional tort, (2) that was directly aimed at the forum, and (3) caused an injury within the forum that the defendant should have reasonably anticipated. *Oldfield*, 558 F.3d at 1220 n.28 (citing *Calder*, 465 U.S. at 789-90) (outlining the prongs of the "effects" test).

In assessing whether litigation "arises out of" the activities in the forum state, the Eleventh Circuit does not use "mechanical or quantitative" tests. *See Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222 (11th Cir. 2009). However, it is "not enough that there be some similarity between the activities that connect the defendant to the forum and the plaintiff's claim." *Licciardello*, 544 F.3d at 1285 n.3. A defendant's contacts with the forum must be related to the "operative facts of the controversy." *Id.*

Finally, if a plaintiff can show that (1) a defendant purposefully availed itself of the laws of the forum state; or (2) the *Calder* "effects" test is satisfied; and (3) its claims arise out of the defendant's activities in the forum state, then the burden shifts to the defendant to show that exercising jurisdiction would offend traditional notions of fair play and substantial justice. *Volkswagen*, 444 U.S. at 292. This requires the court to consider: (1) the burden that would be placed on the defendant if jurisdiction is asserted; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining "convenient and effective relief" in the forum; (4) the interests of the "interstate judicial system" in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering "fundamental substantive social policies." *Id.* (internal citations omitted).

**B.     Rule 12(b)(6)**

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked

12

assertion[s]" without supporting factual allegations. *Id*. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, '*assume their veracity* and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC,* 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)) (emphasis added). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

## IV.      Discussion

Plaintiff has asserted the following Counts under Alabama law: (1) libel *per se*; (2) civil conspiracy; (3) tortious interference with contractual or business relations; (4) private nuisance; and (5) unjust enrichment. (Doc. # 1 at 38-43). On April 21, 2023, Viceroy filed a 12(b)(2) Motion to Dismiss this case for lack of personal jurisdiction, which Defendant Perring later joined. (Doc. # 16). Also on April 21, 2023, Viceroy filed a 12(b)(6) Motion to Dismiss for failure to state a claim. The court addresses each, in turn.

### A.      Viceroy and Perring's 12(b)(2) Motion

Viceroy argues that (1) it has no presence or operations in Alabama; (2) the allegedly defamatory statements were published globally on its website without special focus on Alabama readers; (3) the reports at issue focused on MPT's global operations, rather than any conduct specific to Alabama; and (4) the effects of Viceroy's alleged harm were not "isolated to Alabama; rather the alleged effects were felt by MPT's global shareholders." (*Id*. at 1-2). As a result, Viceroy contends that this court lacks jurisdiction over it, so this case must be dismissed in its entirety.

Plaintiff counters that (1) the sole focus of Viceroy's defamatory publications was an Alabama-based corporation and its Alabama-based operations and employees; and (2) the sole purpose of Viceroy's conduct was to injure MPT, an Alabama-based corporation. (Doc. # 34 at 6). Therefore, Plaintiff asserts, "Viceroy's actions were more than enough to provide it with 'fair warning that it may be subject to suit in Alabama.'" (*Id*.) (quoting *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022)). Accordingly, MPT argues that Defendants' Motion to Dismiss should be denied. In the alternative, MPT requests a limited discovery period focused on gathering evidence to demonstrate personal jurisdiction. (Doc. # 35).

The court first considers whether Viceroy "purposely availed" itself of Alabama as a forum. Next, the court examines whether MPT's claims arise out of or relate to Defendants' alleged contacts with Alabama. Then, the court addresses whether exercising jurisdiction over Defendants would offend traditional notions of fair play and substantial justice. Finally, the court takes up the conspiracy theory of jurisdiction.

### 1.    Purposeful Availment

In assessing purposeful availment, there are "two applicable tests: the effects test and the minimum contacts test." *Del Valle*, 56 F.4th at 1275-76 (citing *Calder*, 465 U.S. at 790; *Keeton* 465 U.S. at 776). Here, Plaintiff contends that the court may exercise personal jurisdiction over Defendants due to their intentionally tortious conduct. (Doc. # 34 at 10-17). Therefore, the court analyzes the question of purposeful availment under the effects test. *See Oldfield*, 558 F.3d at 1220 n. 28 (holding that the applicable test in cases involving intentional torts is the *Calder* "effects" test).

Under the effects test, a court may exercise jurisdiction over a defendant if the defendant committed a tort that was "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Licciardello*, 544 F.3d at 1286 (citing *Ziegler v. Indian River Cty.*, 64 F.3d 470, 474 (9th Cir. 1995)). Here, MPT has clearly alleged that Defendants acted intentionally by repeatedly defaming MPT in order to drive its stock price down and reap the spoils of its short position. Thus, the court considers whether the alleged conduct was aimed at Alabama, and whether that conduct caused harm that Defendants should have anticipated would be suffered in Alabama.

i.    **Plaintiff has adequately alleged that Defendants' allegedly defamatory conduct was aimed at Alabama.**

A defendant's tortious act is aimed at the forum state if it is directed "at a forum resident and injures him there." *Licciardello*, 544 F.3d at 1287. It is undisputed that MPT is a resident of Alabama. It is further undisputed that MPT has alleged a concrete injury. So, the court must determine whether Plaintiff has adequately alleged that (1) the alleged harm was directed at MPT; and (2) MPT felt the effects of the alleged harm in Alabama.

First, the alleged harm was clearly directed at MPT. Defendants allegedly engaged in a months-long campaign accusing MPT of fraud, deceptive accounting practices, self-serving executive compensation structures that hurt the shareholders' bottom line, and a general lack of candor with its shareholders as to its business practices. (Doc. # 31 at 17-31). Each of these accusations was directly targeted at MPT. *See Gubarev v. Buzzfeed*, 253 F. Supp. 3d 1149, 1160 (S.D. Fla. 2017) (holding that a defendant who published a defamatory article on a website the defendant operates and maintains engaged in conduct aimed at the plaintiff).

Further, MPT has alleged it felt the effects of Defendants' alleged harm in Alabama. *Licciardello* concerned an out-of-state defendant's misappropriation of the plaintiff's trademarked name and picture. 544 F.3d 1280 (11th Cir. 2008). In *Licciardello*, the Eleventh Circuit held that the intentional misappropriation of plaintiff's trademarks for commercial gain was conduct "aimed at a specific individual in the forum *whose effects were suffered in the forum*." 544 F.3d at 1288 (emphasis added). Here, the harms allegedly suffered by MPT as a result of Defendants' defamatory conduct -- particularly the lost business opportunity with University Health System and the drop in stock price -- are, if anything, more direct than those alleged in *Licciardello*. Therefore, as the court held in *Licciardello*, the effects of the harm alleged here were felt in the forum state, Alabama.

### ii.   Defendants anticipated or should have anticipated that the harm would be suffered in Alabama.

Because Defendants intentionally aimed their defamatory conduct at MPT in Alabama, they anticipated or "reasonably should have anticipated the harm [from their defamatory statements] would be felt by [Plaintiff] in Alabama." (Doc. # 34 at 14-15) (quoting *AFC Franchising, LLC v. Practice Velocity, LLC*, No. 15-cv-02150, 2016 WL 6024438, at *2 (N.D. Ala. Oct. 14, 2016)) (alterations in original). Moreover, as noted above, Defendants did not shy away from noting that MPT was a Birmingham-based company in the midst of their allegedly defamatory campaign. Indeed, on January 27, 2023, Viceroy tweeted that "[i]n 2003, HealthSouth executives admitted their involvement in similar accounting #fraud to [MPT]. Like [MPT,] *they were based in Birmingham Alabama*. It ended badly with prison time." (Doc. # 1 ¶ 82) (emphasis added).

Defendants cannot now claim ignorance as to whether the brunt of the alleged harm would be felt in Alabama when they made MPT's presence in Alabama a focal point of their attacks. Accordingly, because Plaintiff has alleged that Defendants committed an intentional tort that was aimed at Alabama and that Defendants should have anticipated the harm being felt in Alabama, Plaintiff has established purposeful availment under the effects test.

### 2.   Relatedness

The Eleventh Circuit has not "developed a specific approach to determining whether a defendant's contacts 'relate to' the plaintiff's claims." *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010). But, courts understand that, at a minimum, "the contact must be a 'but-for' cause of the tort." *Id.* (quoting *Oldfield*, 558 F.3d at 1222-23). Here, Plaintiff's claims of defamatory conduct clearly arise out of and relate to Defendants' contact with Alabama because Defendants' only contact with Alabama was that defamatory conduct. The point is as tautological as it is true:

when defamation is the intentional tort establishing contact with the forum state under the effects test, the relatedness element of the personal jurisdiction test will always be satisfied because the defamatory conduct itself establishes both the contact with the forum state and the basis for the plaintiff's claims.

### 3.  Fair Play and Substantial Justice

Because Plaintiff has established purposeful availment and relatedness, the burden shifts to Defendants to show that exercising jurisdiction over it would offend traditional notions of fair play and substantial justice. *See Volkswagen*, 444 U.S. at 292; *Burger King*, 471 U.S. at 477. Defendants argue that "Viceroy has no operations in Alabama and its members are foreign nationals." (Doc. # 16 at 9). In analyzing the *Volkswagen* factors, the court concludes that Defendants have not "presented the requisite 'compelling case' that exercising jurisdiction would be unconstitutionally unfair." *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc*, 593 F.3d 1249, 1274 (11th Cir. 2010) (citing *Volkswagen*, 444 U.S. at 292; *Burger* King, 471 U.S. at 477).

Indeed, as in *Diamond Crystal Brands*, Defendants here do not "even attempt to explain why litigating in [Alabama] would be especially onerous, much less how any such inconvenience achieves a 'constitutional magnitude.'" *Id.* (citing *Burger King*, 471 U.S. at 484). Instead, Defendants offer only the conclusory assertion that "[f]orcing Viceroy to defend a case in Alabama will work a substantial hardship on the company and its members." (Doc. # 16 at 9). But, even if the court accepted as true that litigating in Alabama would prove hard on Viceroy and its members, a forum state's interest in exercising jurisdiction often justifies "serious burdens" on a nonresident defendant. *Diamond Crystal Brands*, 593 F.3d at 1274 (citing *S & Davis Intern., Inc., v. Republic of Yemen*, 218 F.3d 1292, 1305 (11th Cir. 2000)). Accordingly, Defendants have not met their

burden to show that exercising jurisdiction over them would offend traditional notions of fair play and substantial justice.

### 4.    Conspiracy Theory of Jurisdiction

"The Alabama Supreme Court has recognized and adopted the conspiracy theory of jurisdiction." *In re Blue Cross Blue Shield Antitrust Litigation*, 225 F. Supp. 3d 1269, 1302 (N.D. Ala. 2016) (citing *Ex parte United Ins. Cos.*, 936 So. 2d 1049, 1055 (Ala. 2006); *Ex parte McInnis*, 820 So. 2d 795, 806–07 (Ala. 2001)). "Under a conspiracy theory, a defendant who otherwise may not be subject to personal jurisdiction might be [haled] into court if the plaintiff 'plead[s] with particularity the conspiracy as well at the overt acts within the forum taken in furtherance of the conspiracy.'" *Id*. Under Alabama law, a plaintiff seeking to establish civil conspiracy must plausibly allege "(1) concerted action between two or more persons to (2) achieve an unlawful purpose or a lawful purpose by unlawful means." *Id*. at 1302 n. 30 (citing *J&M Assocs., Inc. v. Romero*, 488 F. App'x 373, 375 (11th Cir. 2012)).

Here, even if Plaintiff could not establish jurisdiction under the effects test (and, to be clear, it can), it could do so under the conspiracy theory of jurisdiction. Plaintiff alleges that Defendants "engaged in concerted action with one another and … an[other] investment research firm and its agents to promote and amplify false and defamatory statements about MPT." (Doc. # 1 ¶ 101). Plaintiff contends that Defendants did so "for the purposes of imputing dishonesty or corruption to MPT and of prejudicing MPT in its trade or business." (*Id*. ¶ 102). So, Plaintiff has plainly alleged a civil conspiracy claim under Alabama law. Plaintiff further maintains that "on February 13 and 14, 2023, a co-conspirator traveled to Alabama for an in person 'diligence' trip concerning MPT." (*Id*. ¶ 83). Thus, Plaintiff has alleged the overt acts within Alabama in furtherance of the

conspiracy. Accordingly, Plaintiff has also established personal jurisdiction over Defendants under the conspiracy theory.

      **B.**      **Defendant Viceroy's 12(b)(6) Motion**

Viceroy argues that Plaintiff failed to state a defamation claim because (1) the allegedly defamatory statements listed in Plaintiff's Complaint are non-actionable statements of opinion; and (2) Plaintiff failed to plausibly allege actual malice. (Doc. # 17). Moreover, Viceroy maintains that, because Plaintiff's defamation claim fails, the remaining claims must also fail because they are predicated entirely on the same statements as the defamation claim. (*Id*. at 20). The court first examines whether Plaintiff has properly alleged a defamation claim under general Alabama defamation principles. Then, the court considers whether Plaintiff's claim should be analyzed under the traditional negligence standard or a more demanding "actual malice" standard. Finally, the court addresses Plaintiff's non-defamation claims.

      **1.**      **Plaintiff has sufficiently alleged every element of a defamation claim under Alabama law.**

To state a claim of defamation under Alabama law, a plaintiff must plausibly allege:

> (1) a false *and* defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement."

*Wal-Mart Stores, Inc., v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003) (quoting *McCaig v. Talladega Publ'g Co*., 544 So. 2d 875, 877 (Ala. 1989)) (emphasis in original).

      **i.**      **False and Defamatory Statements**

A statement must be false before it may be actionable at all. *Kelly v. Arrington*, 644 So. 2d 546, 550 (Ala. 1993) (citing *Deutsch v. Birmingham Post Co*., 603 So. 2d 910 (Ala. 1992) ("[i]f the published statements are true, there is no actionable cause for libel"). The Alabama Supreme

Court further held that a "statement of opinion relating to matters of public concern *which does not contain a provably false factual connotation* will receive full constitutional protection" and thus is not actionable. *Id.* (citing *Milkovich v. Lorain Journal Co.*, 496 U.S. 1 (1990) (emphasis added). A statement is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him." Restatement (Second) of Torts § 559 (1977). "A decision whether a statement is reasonably capable of a defamatory meaning is a question of law." *Bell v. Smith*, 281 So. 3d 1247, 1254 (Ala. 2019) (quoting *Cottrell v. National Collegiate Athletic Ass'n*, 975 So. 2d 306, 346 (Ala. 2007)). So, at the pleading stage, a statement will only satisfy the first prong of the defamation test if it is (1) capable of being proven true or false; and (2) potentially damaging to the plaintiff's reputation.

Here, each of the four categories of defamatory statements MPT identified in its Complaint (round-tripping, concealment of its dealings with Steward, fraud, and self-dealing executive compensation structure) may be proven true or false with the benefit of discovery, and the Complaint plausibly alleges that the statements damaged MPT's reputation. A close reading of the statements identified in its Complaint supports Plaintiff's contention that "MPT either engages in 'round-tripping' or it does not." (Doc. # 33 at 14) (citing *Farmland Partners, Inc. v. Rota Fortunae*, No. 18-cv-02351, 2020 WL 12574993, at *15-16 (D. Colo. May 15, 2020)).[2] Similarly, MPT either "paid $205m for hospitals worth $27m in Malta" or it did not. (Doc. # 1 ¶ 63). Such a claim is, again, capable of being proven true or false with the benefit of discovery.

___

[2] The court notes that Plaintiff's explanatory hypothetical as to *Farmland Partners* overstates the holding in that case. The court in *Farmland Partners* did not broadly rule that round-tripping claims are provable. Instead, the court engaged in a fact-specific inquiry and determined that the statements made by the defendant -- among which were detailed allegations of round-tripping similar to those made here -- were *contextually* "capable of being proved true or false." *Farmland Partners*, 2020 WL 12574993, at *16. Here, a fact-specific inquiry would indicate the same finding. But, such a finding does *not* suggest that all revenue round-tripping claims fall into the same category.

Further, Viceroy's several accusations of fraud are capable of being proven true or false because the "ordinary and commonly understood meaning" of fraud "implies some type of illegal or criminal act," which can be proven true or false according to the statute. *Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d 339, 351 (Ala. Civ. App. 2015) ("The undisputed evidence before the trial court was that [the defendant] knowingly published false and defamatory statements about [the plaintiff] and its Board that imputed criminal acts to [the plaintiff]"). Finally, Plaintiff's claims relating to Viceroy's statements on MPT's executive compensation structure, while perhaps less clearly capable of being proven true or false, are sufficient to survive a 12(b)(6) challenge. (Doc. # 1 ¶ 55). Any of these statements have been plausibly alleged to have damaged MPT's reputation and its bottom line. (Doc. # 1 ¶¶ 84-89). So, Plaintiff has plausibly alleged that Viceroy's statements were false and defamatory.

> ### ii.   Communication of False and Defamatory Statements to a Third Party

To state a defamation claim, a "plaintiff must show that the alleged defamatory matter was published by proof of communication of the defamatory matter to someone other than himself." *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1093 (Ala. 1988) (citing § 6-5-182, Ala. Code 1975; *K-Mart Corp. v. Pendergrass*, 494 So. 2d 600 (Ala. 1986)) (internal citations and quotations omitted). "In other words, there must be a communication of a defamatory matter to a third person." *Id*. Here, at least on the pleadings, the publication issue is cut and dry. MPT alleges that Viceroy disseminated defamatory statements through its published reports and its social media account. (Doc. # 1 at 16-37). These allegations are, on their face, sufficient to satisfy the second prong of the defamation standard.

### iii.        Fault Amounting at Least to Negligence

In the defamation context, negligence can be understood as "the publication of false and defamatory statements without reasonable care to determine their falsity." *Anderson v. Smith*, No. 19-cv-222, 2020 WL 10058207, at *1 n.2 (M.D. Fla. March 24, 2020) (quoting *Boyles v. Mid-Fla. Television Corp.*, 431 So. 2d 627 (Fla. 1985); *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018)). Here, Plaintiff alleges that Viceroy either knew or should have known that the allegedly defamatory statements were false because they were contradicted by publicly available information regarding MPT's business and accounting practices. Accordingly, Plaintiff has plausibly alleged that Viceroy was, at a minimum, negligent in publishing the false and defamatory statements.

### iv.        Actionability Regardless of Special Harm

If the allegedly defamatory statements "impute dishonesty or corruption to an individual, they are actionable." *Kelly v. Arrington*, 624 So. 2d 546, 549 (Ala. 1980) (citing *Gray v. WALA-TV*, 384 So. 2d 1062, 1065 (Ala. 1980) (overturned on other grounds by *Nelson*, 534 So. 2d at 1091 n.3)). Further, statements "are defamatory per se if they directly tend to prejudice anyone in his office, profession, trade, or business, or in any lawful employment by which he may gain his livelihood."[3] *Id.*

Here, it is alleged that (1) Viceroy made a number of published reports and social media posts (2) that imputed dishonesty to MPT. (*E.g.*, Doc. # 1 ¶ 71). Moreover, MPT clearly claims that it has been prejudiced in its trade or business. Indeed, Plaintiff alleges that Viceroy's reports and social media posts led directly to (1) the dissolution of its deal with University Health System; (2) S&P Global Ratings downgrading its issuer credit rating; (3) a "sell-off" in MPT's share price;

---

[3] While the weight of authority pertains to individual plaintiffs asserting defamation per se claims, the court notes that corporations may also assert such claims. *See Ponder*, 214 So. 3d at 350-52.

and (4) additional costs incurred to increase security at its Birmingham Headquarters. (Doc. # 1 ¶¶ 85, 87, 88, 89). Accordingly, the allegedly defamatory statements are actionable per se. Because Plaintiff satisfied each prong of the defamation test, Plaintiff has sufficiently alleged every element of a basic defamation claim under Alabama law.

### 2.    Actual Malice Versus Negligence

As outlined above, to allege a defamation claim, a plaintiff must allege that the defendant was *at least* negligent in the publication of false and defamatory statements. *Wal-Mart Stores,* 872 So. 2d at 840. But, "[i]f a plaintiff is … a public official, public figure, or limited-purpose public figure, then the plaintiff has the burden of establishing by clear and convincing evidence that the defamatory statement was made with *actual malice*." *Cottrell*, 975 So. 2d at 333 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)) (emphasis added). Whether a plaintiff is a private, public, or limited-purpose public figure is a matter of law for a court to decide. *Id*. (citing *White v. Mobile Press Register, Inc*., 514 So. 2d 902 (Ala. 1987)) ("A court must determine as a matter of law a plaintiff's classification in the context of a defamation claim.").

"A public figure is one who either has gained notoriety from his achievements or seeks public attention through vigor and success." *Cottrell*, 975 So. 2d at 333. In *Gertz v. Welch*, the Supreme Court expanded on *New York Times v. Sullivan* by recognizing the existence of a "limited-purpose" public figure, to which the actual malice standard also applies. 418 U.S. 323 (1974). A limited purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy." *Cottrell*, 975 So. 2d at 333 (citing *Gertz*, 418 U.S. at 351) (alteration in original).

> **i.      There is insufficient information to determine whether MPT is a general-purpose public figure.**

Viceroy argues that MPT is a public figure by virtue of its status as a publicly traded corporation. (Doc. # 17 at 8, 16). Viceroy principally relies on two unpublished decisions to support this proposition: *MiMedx v. Sparrow Fund Management* and *Borislow v. Canaccord Genuity*. (Doc. # 17 at 16) (citing No. 17-cv-07568, 2018 WL 847014, at *8 (S.D.N.Y. January 12, 2018); and No. 14-cv-80134, 2014 WL 12580259, at *2 (S.D. Fla. June 27, 2014), respectively). Neither case persuades the court that a publicly traded corporation is automatically a general-purpose public figure.

As a primary matter, neither *MiMedx* nor *Borislow* are binding on this court. In *MiMedx*, the Southern District of New York held that "[w]hen the plaintiff is a public figure, *such as a public company*, the plaintiff must demonstrate that the defendant acted with 'actual malice' in connection with the defamatory statements." *MiMedx*, 2018 WL 847014, at *6 (emphasis added) (citing *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1346 (S.D.N.Y 1977) (holding that "a large corporation with more than a billion dollars in assets … whose shares are traded on the New York Stock Exchange is a public figure)). The *MiMedx* court further explained that actual malice was the relevant standard because "*MiMedx is a public company* and the subject matter of the discussion was a matter of public interest." *Id.*, at *8 (emphasis added).

Meanwhile, in *Borislow*, the Southern District of Florida held that the complaint itself demonstrated that a CEO was a public figure because "it stated that [the CEO] took a company through a public offering to a valuation of $2 billion, and allegedly 'revolutionized' long-distance service for 'millions of American Online customers.'" *Borislow*, 2014 WL 12580259, at *2. Citing the complaint, the court also noted that the CEO "had a prominent role in the business community … and there has been extensive media coverage of his business ventures." *Id.*

Here, both *MiMedx* and *Borislow* are unpersuasive. First, the *MiMedx* court's suggestion that all publicly traded corporations are public figures for defamation purposes runs counter to New York precedent, let alone any precedent that would be binding on this court. In *Computer Aid, Inc. v. Hewlett-Packard*, for example, a Pennsylvania federal court applying New York law held that Hewlett-Packard, one of the "largest and most influential corporations in the world with one of the most actively traded stocks on the New York Stock Exchange," was not a public figure. 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999). The court reasoned that Hewlett-Packard did not have "such pervasive fame or notoriety to be deemed a general purpose public figure." *Id*. Moreover, Defendants have failed to identify anything in the Complaint or elsewhere that resembles the factors that lead the *Borislow* court to conclude that the CEO was a public figure. That he was the CEO of a large corporation did not alone establish that he was a public figure, as Viceroy suggests. Ultimately, the court cannot determine from the allegations of the Complaint alone whether MPT is a general-purpose public figure. Thus is an issue best addressed after discovery and with reference to a Rule 56 record.

### ii.    Limited Purpose Public Figure

In its reply brief, Viceroy asserts that "even non-publicly traded corporations are public figures where they voluntarily submit themselves to public regulation." (Doc. # 39 at 3) (citing *Am. Benefit Life Ins. Co. v. McIntyre*, 375 So. 2d 239, 242 (Ala. 1979); *Green Grp. Holdings, LLC v. Schaeffer*, No. 16-cv-00145, 2016 WL 6023841, at *15-17 (S.D. Ala. October 13, 2016) ("Alabama courts have … held that a plaintiff's participation in a heavily regulated industry favors a determination that the plaintiff is a limited purpose public figure.")).

At the outset, the court notes that *Schaeffer* is not a district court opinion. Rather, it is a Magistrate Judge's Report and Recommendation. The case settled before the district court had the

26

opportunity to adopt it. (*See* Case No. 16-cv-00145, ECF No. 52, 53). Still, the court largely agrees with the interpretation of *McIntyre* laid out in *Schaeffer*. The court in *McIntyre* held, and the Magistrate in *Schaeffer* recommended, that certain corporations in certain industries are limited purpose public figures by virtue of their participation in those industries. *McIntyre*, 375 So. 2d at 242; *Schaeffer*, 2016 WL 6023841, at *15-17.

Here, the court cannot find as a matter of Alabama law that MPT is such a company and the real estate investment industry is such an industry. To make such a finding at the motion to dismiss stage, the court would require either (1) a clear holding by the Alabama appellate courts that companies like MPT are limited purpose public figures; or (2) a complaint making clear that MPT has voluntarily injected itself or been drawn into a particular public controversy. Here, because the court does not have the benefit of either, this is an issue better evaluated with a more fully developed record, and the case should be allowed to proceed to discovery. Accordingly, at this stage, the court cannot hold that actual malice is the appropriate standard to apply. Therefore**,** Viceroy's Motion to Dismiss Plaintiff's defamation claim is due to be denied.

### 3.    Plaintiff's Remaining Claims

Viceroy argues that because its "alleged defamatory statements are constitutionally protected opinions and MPT has not plausibly alleged actual malice, its claims for conspiracy, tortious interference…, private nuisance, and unjust enrichment must also fail." (Doc. # 17 at 18). But, there is nothing in the pleadings that would indicate that the alleged defamatory statements are constitutionally protected opinions. So, the issue of whether MPT must allege actual malice is premature. Therefore, Viceroy's Motion to Dismiss is due to be denied in its entirety.

## IV.  Conclusion

For the reasons outlined above, Defendants' 12(b)(2) Motion to Dismiss (Doc. # 16) and Viceroy's 12(b)(6) Motion to Dismiss are due to be denied. An order consistent with this memorandum opinion will be entered separately.

**DONE** and **ORDERED** this June 29, 2023.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE