FILED

2023 Sep-01  PM 02:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MEDICAL PROPERTIES TRUST, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:23-cv-00408-RDP** |
| | } | |
| **VICEROY RESEARCH, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

### I.      Introduction

This matter is before the court on Defendants Gabriel Bernarde and Aidan Lau's 12(b)(6) and 12(b)(2) Motion to Dismiss. (Doc. # 60). In their Motion, Defendants incorporate in full the arguments made by Defendants Viceroy and Fraser Perring in their 12(b)(2) and 12(b)(6) Motions to Dismiss. (Doc. # 60 at 1); (Docs. # 16, 17). In an earlier order, the court denied those Motions (Doc. # 53). The conclusions reached and reasoning applied in deciding those motions apply equally here. While the court will not rehash its analysis in full, it addresses certain points raised by Defendants calling into question the reasoning of the court's analysis in denying Defendants' Viceroy and Perring's Motions. And, for the reasons outlined in that memorandum opinion (Doc. # 56) and those reasons below, Defendants' Motion (Doc. # 60) is due to be denied.

### II.      Background

This case arises out of Defendants Viceroy, Perring, Bernarde, and Lau's alleged efforts to manipulate Plaintiff Medical Properties Trust's ("Plaintiff" or "MPT") stock price in order to

profit on their short position. On March 30, 2023, Plaintiff filed this action alleging defamation and other state law claims.

### A.    MPT's Business Practices

Plaintiff MPT is a real estate investment trust ("REIT") that acquires, develops, and invests in healthcare facilities. (Doc. # 1 ¶ 10). MPT has long been one of Alabama's largest and most prominent publicly traded companies, and its largest REIT. (*Id*. ¶ 1). MPT acquires and develops healthcare facilities to lease out to operating companies under long-term net leases, which require tenants to bear most of the costs associated with the properties. (*Id*. ¶ 20). A typical lease provides for a term of at least 15 years with a series of short renewal options. (*Id*. ¶ 22). MPT's business model is centered around steady, long-term returns for its investors. (*Id*. ¶ 24). To that end, MPT underwrites real estate investments that are attractive to hospital operators, so that if an operator breaks its lease, a replacement operator will be quickly found to assume the lease. (*Id*.).

> Among the characteristics MPT looks for in evaluating hospital real estate are: (1) good physical quality reflecting a history of maintenance and improvements; (2) location in a strong market, with measurable patient demand growth, sustainable reimbursement sources, and features that attract a dedicated workforce; (3) a geographic environment in which the operator is likely to hold a strong competitive position; and (4) facility-level operations with strong EBITDARM (earnings before interest, taxes, depreciation, amortization, rent, and management fees) coverage of lease payments.

(*Id*.). MPT reasons that a medical facility meeting these criteria is likely to reflect a true "community need," meaning its success is not dependent on a given operator. (*Id*.).

For example, in 2016 and 2018, MPT purchased nine Massachusetts hospitals from hospital operator Steward Health Care System for approximately $1.3 billion. (*Id*. ¶ 25). In 2022, private equity firm Macquarie Asset Management entered into a joint venture with MPT for eight of those Massachusetts hospitals, which had a total valuation of about $1.7 billion, an increase in

value over the purchase price of some $400 million. (*Id.*). In the interim, those hospitals had yielded about $475 million in income for MPT. (*Id.*). This is MPT's bread and butter: invest in an attractive facility, generate income from that facility, then sell the facility for a profit.

MPT currently has investments in 444 facilities, the vast majority of which are leased to 55 tenants. (*Id.* ¶ 27). Its revenues exceeded $1.5 billion in 2022, making it "one of the largest REITs in the healthcare sector and among the largest publicly traded companies in Alabama, where the majority of its employees are located." (*Id.*). MPT has retained PricewaterhouseCoopers ("PwC") as its independent auditor since 2008. (*Id.* ¶ 28). Every year since 2008, "PwC has issued an unqualified opinion that MPT's financial statements 'present fairly, in all material respects, the financial position of' the Company and 'the results of its operations and its cash flows' for the relevant periods in conformity with generally accepted accounting principles." (*Id.* ¶ 29).

### B.       Short-Selling and Short-and-Distort Campaigns

Taking a short position involves a bet that a stock's price will fall. A trader takes a short position by "sell[ing] a security first with the intention of repurchasing … later at a lower price." James Chen, *Short Position: Meaning, Overview, and FAQs*, Investopedia (Sept. 12, 2022) https://www.investopedia.com/terms/s/short.asp. Because a stock's price can never fall below $0, the short-seller's potential profit is capped. But, because there is no limit to how high a stock price may rise, short sellers "face unlimited downside risk." (*See id.*).

Because the risk inherent in short selling is so high, some short sellers engage in "short-and-distort" campaigns. (Doc. # 1 ¶ 31). That is, they "publish[] … or otherwise promot[e] false and misleading information about the companies they bet against." (*Id.*). Doing so allows short sellers to "drive down those companies' stock prices and generate profit for themselves." (*Id.*).

The Securities and Exchange Commission has recently proposed a rule designed in part to combat these illegal short-and-distort campaigns. 87 F.R. 14950, 14991-94 (Mar. 16, 2022) ("[I]f short and distort type behavior were to be suspected, then the Commission would be more likely to identify individuals with large short positions and could thus quickly focus any inquiries on entities in an economic position to potentially profit from manipulation.").

### C.     Viceroy and the Individual Defendants' Accusations Against MPT

Defendant Viceroy is a financial research firm founded by Fraser Perring, a citizen of the United Kingdom, along with Gabriel Bernarde and Aidan Lau, both Australian citizens. (*Id.* ¶ 11). On January 26, 2023, Viceroy published a report titled "Medical Properties (dis)Trust," in which it noted that it had a short position in MPT. (Doc. # 1 ¶ 41). That same day, Viceroy and the Individual Defendants began using their Twitter accounts to promote their report and otherwise criticize MPT. (*Id.* ¶ 42). Defendants went on to publish 13 more reports on MPT, purportedly consisting of research on MPT's business practices. (*Id.*). In each of these reports, and in a February 2, 2023 letter Defendants published to Twitter, Viceroy claims to have analyzed and found wanting "the accounting treatment MPT has applied in its financial statements." (*Id.* ¶ 43). MPT identifies four categories of misrepresentations that it asserts subject Defendants to liability: (1) false accusations of "round-tripping;" (2) false characterizations of MPT's executive compensation formula; (3) false accusations of lying about dealings with operator-tenant Steward; and (4) false accusations of fraud and criminal activity. (*Id.* ¶ 45).

### 1.     Round-Tripping

Round-tripping occurs when a party transacts with a counterparty to provide funds with the understanding that the counterparty will later return those funds in a second transaction. (*Id.* ¶ 46). The original party then records the returned funds as revenue. (*Id.*). For example, A agrees

to sell B a pencil for $1. At the outset, both parties agree that A will later purchase the same pencil from B for the same price at which A sold it. When A re-purchases the pencil from B, B records a $1 revenue infusion despite no additional revenue going into its coffers.

Plaintiff provides several examples of Defendants accusing it of round-tripping. (*Id*. at ¶¶ 47-54). Among these allegedly "false, misleading, and defamatory" statements were accusations that: (1) MPT's rent was round tripped by fake purchases of massively inflated assets; (2) MPT has engaged in billions of dollars of uncommercial sale-leaseback transactions; (3) MPT appeared to constantly overpay for fire sale assets by as much as 10x, "which in turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term;" and (4) MPT paid $27.5 million to build a hospital near Houston, Texas despite the total cost of development and market value being only $9.1 million. (*Id*.).

### 2.      Executive Compensation

Viceroy also claimed that MPT executives profited under an executive compensation program that "encourage[d] an aggressive, acquire-at-any-cost policy which ultimately align[ed] with a revenue round-tripping model." (*Id*. ¶ 55). Viceroy further claimed that, because acquisitions were a factor in its calculation, this compensation structure led MPT management to "consistently scrape[] the bottom of the barrel in its search for new properties and new tenants." (*Id*.). MPT alleges that these statements are false, misleading, and defamatory because (1) after total acquisition value reaches a certain threshold (which was well surpassed in 2020 and 2021), executives receive no credit per new acquisition; and (2) poorly performing acquisitions negatively affect other compensation inputs. (*Id*. ¶ 56-57). So, any conceivable advantage an executive might receive from blindly acquiring unprofitable properties is negated by the harm such a strategy would do to the executive's bottom line.

### 3.    Allegations of Concealment

MPT maintains an extensive business relationship with operator-tenant Steward Healthcare Systems, the largest private physician-led healthcare network in the United States. (*Id.* ¶ 58). MPT also has a direct equity stake in Steward of just under 10% and has made loans to Steward that MPT deemed beneficial. (*Id.*). Despite past success in its dealings with Steward, MPT informed its investors on earnings calls that it has sought to diversify its portfolio and reduce its relative exposure to Steward. (*Id.*).

One of Viceroy's lines of attack on MPT concerned MPT's relationship with Steward. Viceroy allegedly released a series of reports claiming that MPT is "deliberately concealing a secret ownership in certain Steward-connected hospitals in Malta." (*Id.* ¶ 59). Specifically, Viceroy (1) claimed that MPT "paid $205m for 3 hospitals worth $27m in Malta that were purportedly under investigation for corruption" (*Id.* ¶ 63) (internal quotations omitted); (2) published an organizational chart that showed MPT as an owner of "Steward Malta" (*Id.* ¶ 65); and (3) repeatedly accused MPT of fraudulently concealing its investment in Maltese hospitals. (*Id.* ¶¶ 66-69). MPT denies any direct investment in Maltese hospitals.[1]

### 4.    Public Accusations of Fraud

In addition to the allegedly defamatory statements included in Viceroy's reports, Viceroy and the Individual Defendants have taken to social media to accuse MPT of fraud and other criminal wrongdoing. For example, throughout February 2023, Defendant Perring tweeted separately that: (1) MPT "is verging on the largest US #Healthcare #fraud;" (2) MPT and Steward are "#Fraudulent piece[s] of [expletive];" (3) MPT is a "#ponzi scheme reliant on

---

[1] In its Complaint, MPT outlines its relationship to the hospitals in Malta in detail. (Doc. # 13 ¶¶ 60-62). But, it is unnecessary for the court to address the description of that relationship here.

#RoundTripping, insane #AFFO, with @Steward & #MPW are part of an international corruption investigation. #Fraud everywhere…to quote one great man, #ItsAScam;" (4) MPT and Steward are "bad actors, with fraudulent and deceitful operations." (*Id*. ¶ 71). Perring also repeatedly assured his Twitter followers that MPT executives would soon be criminally charged and imprisoned for their wrongdoing, and that MPT would soon be mired in class action lawsuits. (*Id*. ¶ 72).

### D. Viceroy's Disclaimers

In each of its reports on MPT, Viceroy included a blanket disclaimer that the report "has been prepared for educational purposes only and expresses [Viceroy's] opinion," and that no information in the report should be construed as "an opinion on the merits or otherwise of any particular investment or investment strategy."(*Id*. ¶ 74). For its part, MPT alleges that "the false, misleading, and defamatory statements identified in [its] Complaint are not 'opinions' or 'beliefs' but rather statements of purported fact, whose fundamental character cannot be altered by disclaimers." (*Id*. ¶ 76).

### E. Other Allegations

#### 1. Conspiracy

In addition to its defamation claims, MPT alleges that Viceroy has conspired with another financial research firm who shares an interest in driving MPT's stock price down. That firm, unnamed in the Complaint, generates revenue from subscriptions and benefits when its predictions about particular stocks pan out. (*Id*. ¶ 78). To that end, agents of the conspirator firm have allegedly amplified Viceroy's attacks on MPT and engaged in similar attacks on social media in an effort to harm MPT. (*Id*. ¶ 79-80).

### 2.     Conduct Directed at Alabama

MPT claims that Viceroy knew MPT was headquartered in Birmingham, Alabama, and that its executives and employees primarily lived and worked in Birmingham when it began these allegedly defamatory attacks. (*Id*. ¶ 81-82). As a result, MPT contends that Viceroy could have reasonably expected that MPT "would suffer the effects of [Viceroy's] defamatory falsehoods in Alabama." (*Id*. ¶ 82). Indeed, not only did MPT repeatedly disclose its principal place of business in public securities filings, but Viceroy acknowledged that it knew MPT was located in Birmingham. (*Id*.). In January 2023, Viceroy tweeted: "[i]n 2003 HealthSouth executives admitted their involvement in similar accounting #fraud to [MPT]. Like [MPT] they were based in Birmingham, Alabama." (*Id*.). Additionally, the February 2, 2023 letter Viceroy posted to Twitter was addressed to a partner in PwC's Birmingham office. (*Id*. ¶ 83). Finally on February 13 and 14, 2023, Plaintiff alleges that a conspirator traveled to Alabama to conduct diligence concerning MPT. (*Id*.).

### 3.     Concrete and Ongoing Harm to MPT

In March 2023, Steward sought to broker a deal with a Texas health system involving an MPT-owned hospital. (*Id*. ¶ 85). But, the health system backed out of the deal, citing a Viceroy report and publicly stating that its "mission and values are not aligned with Medical Properties Trust." (*Id*.). Further, S&P Global Ratings downgraded MPT's issuer credit rating, which raised MPT's cost of borrowing money. (*Id*. ¶ 87). MPT also believes that Viceroy's actions have strained its relationship with bondholders. (*Id*.). MPT points to a report by market research firm Green Street in which it notes that Viceroy "contributed to the sell-off in [MPT's] share price." (*Id*. ¶ 88) (alterations in original). Finally, in its pleadings, MPT details the cost it has been

forced to incur to retain employees and increase security at its Birmingham headquarters in response to Defendants' attacks on MPT and its executives. (*Id*. ¶ 89).

## III.    Legal Standards

### A.    Rule 12(b)(2) Motion to Dismiss

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see Posner v. Essex Ins. Co*., 178 F.3d 1209, 1214 (11th Cir. 1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction.").

"A federal district court in [Alabama] may exercise personal jurisdiction over a nonresident defendant to the same extent that [an Alabama state] court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008); *see* Ala. R. Civ. P. 4.2. The Supreme Court recognizes two types of personal jurisdiction that are consistent with these requirements: general jurisdiction and specific jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-24 (2011). Only the court's exercise of specific jurisdiction is at issue here.

The court applies a two-part analysis in determining whether there is specific personal jurisdiction over a nonresident defendant. *See Cable/Home Cmmc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); *see also Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989). First, the court considers the jurisdictional question under the state long-arm statute. *See Cable/Home Commc'n Corp*., 902 F.2d at 855; *see*

*also Alexander Proudfoot Co*., 877 F.2d at 919. If there is a basis for asserting personal jurisdiction under the state statute, the next question is whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *Cable/Home Commc'n Corp*., 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919. A federal court may exercise personal jurisdiction over a nonresident defendant only if both prongs of the analysis are satisfied.

Federal courts are required to construe the Alabama long-arm statute the same way the Supreme Court of Alabama would. *See Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890-91 (11th Cir. 1983). Alabama's long-arm statute permits personal jurisdiction to the extent it "is not inconsistent with the [Alabama Constitution] or the Constitution of the United States." Ala. R. Civ. P. 4.2(b). Thus, the question here is whether assertion of personal jurisdiction over Defendants comports with the Fourteenth Amendment's Due Process Clause. *See Olivier v. Merritt Dredging Co.*, 979 F.2d 827 (11th Cir. 1992) (citing *Alabama Waterproofing Co., Inc. v. Hanby*, 431 So. 2d 141, 145 (Ala. 1983)).

The requirements of the Fourteenth Amendment's Due Process Clause are met where (1) the defendant has minimum contacts with the forum state, and (2) the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." *Olivier*, 979 F.2d at 830-31; *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (quoting *International Shoe*, 326 U.S. at 316). A defendant has established minimum contacts with the forum state when he has "'purposefully availed' himself of the benefits of conducting activities in the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Burger King v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (cleaned up); *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).

A defendant purposefully avails itself of the privileges of conducting activities in a state "where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). "Thus[,] where the defendant deliberately has engaged in significant activities within a State … or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Id.* at 475-76 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984); *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648 (1950)).

As the Supreme Court has consistently held, the mere foreseeability of causing injury in another state is not a "sufficient benchmark" for exercising personal jurisdiction. *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Rather, to be subject to the court's in personam jurisdiction, a defendants' "conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *Volkswagen*, 444 U.S. at 297). In determining whether a defendant should have reasonably anticipated litigation in the forum, the Court has held that it is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added).

Alternatively, a plaintiff harmed by an intentional tort may be afforded the opportunity to seek redress where the harm was felt even if the defendant has not otherwise purposefully availed itself of that forum. *Calder v. Jones*, 465 U.S. 783, 790 (1984) ("[a]n individual injured

11

in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."). The *Calder* effects test requires a showing that the defendant (1) committed an intentional tort, (2) that was directly aimed at the forum, and (3) caused an injury within the forum that the defendant should have reasonably anticipated. *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.28 (citing *Calder*, 465 U.S. at 789-90) (outlining the prongs of the "effects" test).

In assessing whether litigation "arises out of" the activities in the forum state, the Eleventh Circuit does not use "mechanical or quantitative" tests. *See id.* at 1222 (11th Cir. 2009). However, it is "not enough that there be some similarity between the activities that connect the defendant to the forum and the plaintiff's claim." *Licciardello*, 544 F.3d at 1285 n.3. A defendant's contacts with the forum must be related to the "operative facts of the controversy." *Id*.

Finally, if a plaintiff can show that (1) a defendant purposefully availed itself of the laws of the forum state; or (2) the *Calder* "effects" test is satisfied; and (3) its claims arise out of the defendant's activities in the forum state, then the burden shifts to the defendant to show that exercising jurisdiction would offend traditional notions of fair play and substantial justice. *Volkswagen*, 444 U.S. at 292. This requires the court to consider: (1) the burden that would be placed on the defendant if jurisdiction is asserted; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining "convenient and effective relief" in the forum; (4) the interests of the "interstate judicial system" in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering "fundamental substantive social policies." *Id*. (internal citations omitted).

### B.      Rule 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, '*assume their veracity* and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC,* 413 F. App'x 136,

138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)) (emphasis added). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

## IV.   Discussion

Plaintiff has asserted the following claims under Alabama law: (1) libel per se; (2) civil conspiracy; (3) tortious interference with contractual or business relations; (4) private nuisance; and (5) unjust enrichment. (Doc. # 1 at 38-43). On July 12, 2023, Bernarde and Lau filed a Motion to Dismiss this case under Rule 12(b)(2) and Rule 12(b)(6). (Doc. # 60). Plaintiff opposes the motion (Doc. # 62) and Bernarde and Lau have replied to that opposition. (Doc. # 63). The court addresses the parties' arguments below.

### A.   Defendants' 12(b)(2) Motion to Dismiss

As explained above, the court will not fully rehash its analysis of the similar issues raises in previously ruled upon motions that were filed by Viceroy and Perring. (Doc. # 52). But, the court addresses Defendants' "request that the Court reconsider its ruling" on the grounds that the court "overlooked substantial circuit authority [and] its own precedent rejecting the sweeping application of the 'effects test' … that it applied here." (Doc. # 60 at 2).

#### 1.   *SWAC v. Urban Edge*

Defendants argue that this court "recently found no jurisdiction in a case strikingly similar to this one." (*Id.*) (citing *Southwestern Athletic Conf.* ["*SWAC*"] *v. Urban Edge Network, LLC*, No. 22-cv-486, 2022 WL 17721584 (N.D. Ala. December 15, 2022)). In that case, an

14

athletic conference (the "SWAC") asserted state law claims of defamation, tortious interference, and misrepresentation against a broadcaster that had contacted member institutions in an effort to acquire the rights to market or distribute athletic and other events. *SWAC*, 2022 WL 17721584, at *1. The court held that the plaintiff had failed to establish personal jurisdiction under the "effects" test because the plaintiff failed to allege that Alabama was the "focal point" of the defendants' conduct. *Id*. at *4. As the court explained, "Plaintiff does not allege that any of the referenced third parties contacted by Defendants are located in Alabama. Nor does Plaintiff suggest that the allegedly improper communications took place when any relevant party to those communications was in Alabama." *Id*. at *5.

The court in *SWAC* considered whether an Alabama plaintiff could establish personal jurisdiction over a foreign defendant when that defendant's conduct consisted of contacting a number of independent institutions, none of which were located in Alabama. The only party in that case with any connection to Alabama was SWAC, an organization with which the independent institutions were affiliated. The contact was between a foreign plaintiff and foreign third-party institutions, regarding rights to broadcast events that would take place in states other than Alabama.

Such indirect contact with the forum state stands in stark contrast to the facts alleged here. In *SWAC*, there was no indication that any of the defendant's contacts with the member institutions referenced SWAC or Alabama, or otherwise implicated – let alone targeted – the SWAC plaintiffs in any meaningful way. To the contrary, here, Viceroy made several directly disparaging public statements about a corporation located in Alabama. (*See* Doc. # 1 ¶ 71). Among these were direct public accusations of fraud and corruption, referring to Plaintiff by name. (*Id*.). Indeed, remarkably, Viceroy tweeted that "HealthSouth executives admitted their

involvement in similar accounting #fraud to [Plaintiff]. Like [Plaintiff,] *they were based in Birmingham Alabama*." (*Id*. ¶ 82) (emphasis added). As the court stated previously, Plaintiff plainly alleged that Defendants aimed their conduct at Alabama, and that Plaintiff felt the effects in its home state. (Doc. # 56 at 15-17). Defendants' attempts to analogize this case to *SWAC* are misplaced.

### 2.      Conspiracy Theory of Jurisdiction

Defendants also "request that the Court reconsider its holding that jurisdiction is appropriate under the conspiracy theory of jurisdiction." (Doc. # 60 at 5). Defendants argue that Plaintiff has failed to plausibly allege a conspiracy because it "does not identify who the co-conspirators are, when and how the conspiracy was formed, or the object of the conspiracy." (*Id*.). That assertion is questionable but, in any event, this is not the standard a court applies in deciding whether a plaintiff has plausibly alleged a civil conspiracy under Alabama law.

In Alabama, "[t]o establish personal jurisdiction under a conspiracy theory, the plaintiff must 'plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'" *J&M Assocs., Inc. v. Romero*, 488 F. App'x 373, 375 (11th Cir. 2012) (citing *Ex parte McInnis*, 820 So. 2d 795, 806-07 (Ala. 2001)). "The elements of civil conspiracy in Alabama are: (1) concerted action by two or more persons to (2) achieve an unlawful purpose or a lawful purpose by unlawful means." *Id*. (citing *Luck v. Primus Auto. Fin. Servs., Inc*., 763 So. 2d 243, 247 (Ala. 2000)). "To be sure, the conspiracy averments in the complaint must exceed 'bald speculation' and mere conclusory assertions." *Ex parte Reindel*, 963 So. 2d 614, 623 (Ala. 2007) (citing *Ex parte McInnis*, 820 So. 2d at 806-807)). "However, this burden is not heavy … because to require a more substantial showing in a case alleging a

civil conspiracy would be harsh, if not impossible in view of the difficulties of pleading and proving a conspiracy." *Id*. (cleaned up).

Here, Plaintiff has alleged that Defendants conspired with another financial research firm that "generates revenue from subscriptions, and has acknowledged publicly that its continued profitability turns on whether its predictions of a particular stock pans out." (Doc. # 1 ¶ 78). Moreover, in its pleadings, Plaintiff precisely alleged the conduct in which the conspiracy engaged: "Defendants and the agents of this co-conspirator firm have parroted one another's language and accusations about MPT, retweeting each other's messages with accompanying words of support," as well as "accus[ing] MPT and its executives of fraud and artificial boosting of executive compensation, and both have perpetuated false statements about MPT's supposed ownership of Malta hospitals." (*Id*. ¶ 79). Further, Plaintiff alleged that the intended outcome of the conspiracy was to "drive down MPT's stock price." (*Id*. ¶ 78). Finally, Plaintiff alleges that one of the conspirators traveled to Alabama on February 13 and 14, 2023, on an in-person "diligence" trip concerning MPT. (*Id*. ¶ 83).

In sum, Plaintiff has clearly alleged a civil conspiracy claim under Alabama law. Plaintiff has also alleged concerted action between Defendants and another financial research firm (which, while not named, is clearly described with particularity). Plaintiff has further alleged Defendants' concerted actions were designed to achieve a lawful purpose (the collapse of MPT's stock price) by unlawful means (defamatory statements). And, Plaintiff has alleged that overt acts were undertaken in the forum state that were designed to further the conspiracy. Accordingly, on the face of the pleadings, the conspiracy theory of jurisdiction applies here.

**B.**     **Defendants' 12(b)(6) Motion**

Defendants also request that the court reconsider its denial of Defendant Viceroy and Perring's 12(b)(6) Motion to Dismiss, and contend "the court did not address key facts and controlling law." (Doc. # 60 at 5). Again, the court will not rehash its analysis in full. However, the court again addresses certain arguments made by Defendants.

**1.**     **Plaintiff alleged that Defendants' statements were false and defamatory.**

The court begins by noting that, in their 12(b)(6) Motion, Defendants contend only that the statements in Viceroy's published reports were not defamatory. (Doc. # 60 at 5-7). Of course, these are not the only statements at issue. Plaintiff alleges that the social media campaign in which Defendants allegedly engaged was replete with defamatory statements consisting of tweets and a letter posted to Twitter, which were independent of the reports. (*See, e.g.*, Doc. # 1 ¶¶ 48, 49, 50, 55, 56, 66, 71, 72, 73, 82). So, even if the court concluded that the statements in Viceroy's reports were unactionable (and, to be clear, the court does not reach that conclusion), Defendants would not be entitled to the dismissal of this action under Rule 12(b)(6).

Defendants argue that the statements in Viceroy's reports are unactionable because "the published report[s] expressly state[] that the conclusions therein are the opinions of the authors." (Doc. # 60 at 5-6) (citing *Turner v. Wells*, 879 F.3d 1254, 1264-65 (11th Cir. 2018)). To that end, Defendants further contend that the reports "are not the stuff of libel" because the reports "express opinions based on disclosed, publicly available facts … with robust disclaimers clarifying that the conclusions are nothing more than the author's opinions." (*Id.* at 6) (citing *Turner*, 879 F. 3d at 1265). Importantly, Defendants suggest that "MPT does not allege or argue that the supporting evidence cited is fabricated or inaccurate–because it is not." (*Id.*).

18

This is simply untrue. Even a cursory examination of Plaintiff's Complaint reveals a number of allegations that the evidence cited in Plaintiff's reports is, at the very least, inaccurate. (*See, e.g.*, Doc. # 1 ¶¶ 47, 52, 59, 63, 64, 65, 68, 69). Whether Plaintiff's factual allegations will ultimately be proven is a separate question, and one not appropriate for the court to consider at this stage of the litigation. Plaintiff alleges, repeatedly and in detail, how the purported evidence underlying Viceroy's conclusions is false. The allegedly false evidence underlying the conclusion is not merely a statement of opinion, and the publication of the allegedly false evidence cannot be made into an opinion even with "robust cautionary disclaimers that the conclusions therein were opinion only." (Doc. # 60 at 7).

Defendants rely heavily on *Turner v. Wells* to support their contention that statements of opinion are not actionable. 879 F.3d at 1264-65. *Turner* concerned a report prepared by a law firm following an investigation into the bullying of Miami Dolphins player Jonathan Martin. *Turner*, 879 F.3d at 1259. That report detailed several instances of inappropriate behavior in which the plaintiff engaged, including, as relevant here, (1) his participation in homophobic taunting of the player; (2) his "poor judgment" in texting the player; (3) his failure to stop insulting comments of which he was aware; and (4) the establishment of a "Judas Code," according to which "snitches" would be fined. *Turner*, 879 F.3d at 1263-1268.

In *Turner*, the court held that statements in the report were not actionable because the purportedly defamatory statements were merely opinions and conclusions based on uncontroverted evidence that was also included in the report. *Id*. Indeed, the Panel repeatedly stressed that the plaintiff did not challenge the truthfulness of the underlying evidence. *See, e.g., Turner*, 879 F.3d at 1264 (listing undisputed facts underlying the defendant's conclusion). Here, as discussed above, Plaintiff has plainly alleged that the evidence underlying the conclusions in

19

Viceroy's reports was inaccurate. So, while the court agrees that conclusions or statements of opinion based on undisputed facts are nonactionable, the publication of allegedly false information underlying a conclusion or opinion does not fall into that category. Plaintiff's 12(b)(6) Motion is due to be denied.

### 2.      Actual Malice

Finally, the court briefly addresses Defendants' request that the court apply the "actual malice" standard despite its prior ruling that the record was insufficiently developed to do so. (Doc. # 60 at 7-9); (Doc. # 56 at 23-27). Defendants maintain that "MPT is, at a minimum, a limited purpose public figure for the purposes of this dispute." In its Reply Brief in support of its Motion to Dismiss (which, again, Defendants incorporated here), Viceroy argued that a corporation may be considered a limited purpose public figure by virtue of its participation in a heavily regulated industry. (Doc. # 39 at 3-5). In its decision on Defendants Viceroy and Perring's Motions to Dismiss, the court laid out the framework by which a corporation may be considered a limited purpose public figure under Alabama law. (Doc. # 56 at 26). The court reiterates that it has insufficient information to make a determination on that issue at this stage of the case.

Defendants chide the court for its unwillingness to determine whether actual malice is the applicable standard at this stage in the litigation. (Doc. # 60 at 9). To be sure, the standard governing Plaintiff's claim should be determined as early in the litigation as possible. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). But, in *Michel*, the court determined that the question of whether actual malice was properly plead should be decided purely on the pleadings when the plaintiff's status as a public figure *is not in dispute*. *Id*. The matter is undoubtedly complicated when the question is not just whether actual malice *was* plead, but

whether the plaintiff was a public figure and therefore the plaintiff was *required* to plead actual malice.

Indeed, "courts regularly find that the determination of a litigant's status as a public or private figure should be deferred until summary judgment when a full factual record can be developed." *LifeMD, Inc. v. Lamarco*, 607 F. Supp. 3d 576, 591 (W.D. Pa. 2022) (citing *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 455-56 (E.D. Pa. 2021); (*Gillon v. Bernstein*, No. 12-04891, 2013 WL 5159625, at *5 (D. N.J. Sept. 12, 2013) ("the [c]ourt finds it appropriate to defer the public figure inquiry until after the record has been more fully developed through discovery") (alterations in original); *Trivedi v. Slawecki*, No. 11-cv-02390, 2012 WL 5987410, at *3 (M.D. Pa. Nov. 28, 2012) (whether a plaintiff is a public figure "is more appropriately resolved at the summary judgment stage on the basis of record evidence.")).

As to Defendants' suggestion that discovery would not reveal anything not already known with respect to establishing Plaintiff's status as a public figure, the court disagrees. (Doc. # 60 at 9). For example, information about the (1) "notoriety of the corporation to the average individual in the relevant geographic area;" (2) "the nature of the corporation's business;" and/or (3) "the frequency and intensity of media scrutiny that a corporation normally receives" relates to matters that should be examined during discovery and the answers to those inquires would greatly aid the court in determining whether Plaintiff is a public figure. *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1329 (5th Cir. 1993) (establishing a nonexclusive three-part test to determine whether a corporation is a public figure in the absence of "a general rule to be applied to corporations.").

**IV.     Conclusion**

For the reasons above, Defendants' 12(b)(2) and 12(b)(6) Motions to Dismiss (Doc. # 60) are due to be dismissed. An order consistent with this memorandum opinion will be entered separately.

**DONE** and **ORDERED** this September 1, 2023.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE