FILED
2024 Mar-08 PM 05:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 6

Relevant Portions of MPT's 2023 Form 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2023
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____
Commission file number 001-32559
Commission file number 333-177186

## Medical Properties Trust, Inc.
## MPT Operating Partnership, L.P.
**(Exact Name of Registrant as Specified in Its Charter)**

| | | |
|---|---|---|
| **Maryland** | | **20-0191742** |
| **Delaware** | | **20-0242069** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | | **(IRS Employer Identification No.)** |
| **1000 Urban Center Drive, Suite 501** | | |
| **Birmingham, AL** | | **35242** |
| **(Address of Principal Executive Offices)** | | **(Zip Code)** |

**(205) 969-3755**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 per share, of Medical Properties Trust, Inc. | MPW | The New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Medical Properties Trust, Inc.   Yes ☒   No ☐       MPT Operating Partnership, L.P.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Medical Properties Trust, Inc.   Yes ☐   No ☒       MPT Operating Partnership, L.P.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Medical Properties Trust, Inc.   Yes ☒   No ☐       MPT Operating Partnership, L.P.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Medical Properties Trust, Inc.   Yes ☒   No ☐       MPT Operating Partnership, L.P.   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

**Medical Properties Trust, Inc.**

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

**MPT Operating Partnership, L.P.**

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.   ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.   ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).   ☐

Indicate by check mark whether the registrant is a shell company (as defined in 12b-2 of the Act).
Medical Properties Trust, Inc.   Yes ☐   No ☒       MPT Operating Partnership, L.P.   Yes ☐   No ☒

As of June 30, 2023, the aggregate market value of the 591.3 million shares of common stock, par value $0.001 per share ("Common Stock"), held by non-affiliates of Medical Properties Trust, Inc. was $5.5 billion based upon the last reported sale price of $9.26 on the New York Stock Exchange on that date. For purposes of the foregoing calculation only, all directors and executive officers of Medical Properties Trust, Inc. have been deemed affiliates.

As of February 16, 2024, 599.1 million shares of Common Stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement of Medical Properties Trust, Inc. for the Annual Meeting of Stockholders to be held on May 30, 2024 are incorporated by reference into Items 10 through 14 of Part III, of this Annual Report on Form 10-K.

market terms basis may be subject to a 100% excise tax. While we believe that all of our transactions with our TRS are at arm's length, imposition of a 100% excise tax could have a material adverse effect on our financial condition and results of operations.

*Loans to our tenants could be characterized as equity, in which case our income from that tenant might not be qualifying income under the REIT rules and we could lose our REIT status.*

Our TRS may make loans to tenants of our facilities to acquire operations or for working capital purposes. The IRS may take the position that certain loans to tenants should be treated as equity interests rather than debt, and that our interest income from such tenant should not be treated as qualifying income for purposes of the REIT gross income tests. If the IRS were to successfully treat a loan to a particular tenant as an equity interest, the tenant would be a "related party tenant" with respect to our company and the rent that we receive from the tenant would not be qualifying income for purposes of the REIT gross income tests. As a result, we could be in jeopardy of failing the 75% income test discussed above, which if we did would cause us to lose our REIT status. In addition, if the IRS were to successfully treat a particular loan as interests held by our operating partnership rather than by our TRS, we could fail the 5% asset test, and if the IRS further successfully treated the loan as other than straight debt, we could fail the 10% asset test with respect to such interest. As a result of the failure of either test, we could lose our REIT status, which would subject us to corporate level income tax and adversely affect our ability to service our debt and make distributions to our stockholders.

*Certain transfers may generate prohibited transaction income, resulting in a penalty tax on gain attributable to the transaction.*

From time-to-time, we may transfer or otherwise dispose of some of our properties, including by contributing properties as part of joint venture investments. Under the Code, any gain resulting from transfers of properties we hold as inventory or primarily for sale to customers in the ordinary course of business is treated as income from a prohibited transaction subject to a 100% penalty tax. We do not believe that our transfers or disposals of property or our contributions of properties into joint venture investments are prohibited transactions. However, whether property is held for investment purposes is a question of fact that depends on all the facts and circumstances surrounding the particular transaction. The IRS may contend that these types of transfers or dispositions are prohibited transactions. While we believe that the IRS would not prevail in any such dispute, if the IRS were to argue successfully that a transfer, disposition, or contribution of property constituted a prohibited transaction, we would be required to pay a 100% penalty tax on any gain allocable to us from the prohibited transaction. In addition, income from a prohibited transaction might adversely affect our ability to satisfy the income tests for qualification as a REIT.

*Changes in U.S. or foreign tax laws, regulations, including changes to tax rates, may adversely affect our results of operations.*

We are headquartered in the U.S. with subsidiaries and investments globally and are subject to income taxes in these jurisdictions. Significant judgment is required in determining our provision for income taxes. Although we believe that we have adequately assessed and accounted for our potential tax liabilities, and that our tax estimates are reasonable, there can be no assurance that additional taxes will not be due upon audit of our tax returns or as a result of changes to applicable tax laws. The U.S. government, as well as the governments of many of the locations in which we operate (such as Germany, the U.K., Colombia, Portugal, Spain, Finland, and Luxembourg, which is where most of our Europe entities are domiciled) are actively discussing changes to corporate taxation. Our future tax expense could be adversely affected by these changes in tax laws or their interpretation, both domestically and internationally. Potential tax reforms being considered by many countries include changes that could impact, among other things, global tax reporting, intercompany transfer pricing arrangements, the definition of taxable permanent establishments, and other legal or financial arrangements. The nature and timing of any changes to each jurisdiction's tax laws and the impact on our future tax exposure both in the U.S. and abroad cannot be predicted with any accuracy but could materially and adversely impact our results of operations and cash flows.

**ITEM 1B.** *Unresolved Staff Comments*

The Company from time to time receives written comments from the staff (the "Staff") of the SEC's Division of Corporation Finance regarding the Company's periodic or current reports under the Securities Exchange Act of 1934, as amended. On July 3, 2023, we received a comment letter from the Staff requesting that we amend our Annual Report on Form 10-K for the fiscal year ended December 31, 2022 to include the audited financial statements of Steward as of and for the year ended December 31, 2022. On July 18, 2023, we responded to the comment letter and confirmed our intention to file such audited financial statements of Steward via Form 10-K/A promptly upon our receipt of the same from Steward. We reiterated our commitment to file such Steward financial statements in responses to further Staff comment letters received in November 2023 and January 2024.

As of the date of this annual report, however, we have not received from Steward its audited financial statements as of and for the year ended December 31, 2022, despite repeated requests by the Company pursuant to the terms of the Company's leases with Steward. In our responses to the Staff, the Company respectfully noted that Steward is an independent third party that the Company does not control, and that there are no Board member, officer, or employee overlaps between the Company and Steward that could

help facilitate the provision of the audited financial statements of Steward. Furthermore, we noted that the Company's maximum equity investment in Steward is limited to a passive 9.9% interest under applicable tax law. As a result, we respectfully advised the Staff that the Company does not have the means to unilaterally compel the timely completion and delivery of Steward's audited financial statements for filing with the SEC. As a private non-reporting and non-listed company, Steward is not otherwise required by law to produce audited financial statements for public release.

In its most recent response to the Staff on February 8, 2024, the Company nevertheless reaffirmed its commitment to file Steward's audited financial statements for the year ended December 31, 2022, via Form 10-K/A promptly upon receipt.

**ITEM 1C.** *Cybersecurity*

**Cyber Risk Management and Strategy**

We have developed, implemented, and continue to maintain processes and procedures to identify and mitigate cybersecurity risks across our company (including our offices in Europe). Because we rely on various information technology systems and software programs to operate our business, we have an extensive cybersecurity program designed to protect our properties and confidential data. Our cybersecurity risk management and strategy program includes the following:

- implementing the latest software releases and tools (including multi-factor authentication) in a timely manner;

- seek to minimize the amount of personal information collected and stored about our employees and seek to avoid any collection and storage of non-financial or contact information from our tenants/borrowers;

- constant security monitoring of computers, networks, and cloud-based information assets to detect and respond to cybersecurity risks and threats;

- third party internal and external vulnerability assessments and penetration testing;

- annual review and audit of cyber controls and procedures;

- periodic review of cybersecurity procedures and implementation of new procedures as necessary to adhere to cybersecurity standards set forth by the National Institute of Standards and Technology;

- periodic evaluation and review of cybersecurity risks associated with our use of key third-party business partners, vendors, and service providers. Because we do not control the systems or cybersecurity plans put in place by such third parties, and we may have limited contractual protections with such parties, we may be negatively impacted as a result of threats or incidents experienced by such third parties;

- security awareness training provided during employee onboarding process and successful completion required at least annually for all employees with passing requirements;

- employee anti-phishing campaigns performed at least quarterly;

- a cybersecurity incident response plan, which is reviewed annually, but generally consists of a coordinated approach to investigating, containing, documenting, and reporting findings and keeping management and others informed and involved as appropriate; and

- a cybersecurity risk insurance policy.

We have not identified any known cybersecurity threats or incidents within the prior year that have materially affected or are reasonably likely to materially affect us, including our overall business strategy, results of operations, or financial condition. Although we have taken steps to protect the security of our information systems and the data maintained in those systems, there is no guarantee the measures and security we have implemented will be successful in detecting and preventing a cybersecurity incident. Please refer to Item 1A of this Annual Report on Form 10-K for more information regarding additional risks related to cybersecurity and information technology.

**Cyber Governance**

Cybersecurity holds a pivotal role in our comprehensive risk management processes and is a key focus for both our Board and management. Our management has primary responsibility for identifying, assessing, and managing our exposure to cybersecurity threats and incidents. However, the Board, led by members of the Risk Committee, oversees the enterprise risk management process, specifically addressing material risks stemming from cybersecurity threats.