# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MEDICAL PROPERTIES TRUST, INC., <br><br> Plaintiff, <br><br> - v. - <br><br> VICEROY RESEARCH LLC; FRASER JOHN PERRING; GABRIEL BERNARDE; and AIDAN LAU, <br><br> Defendants. | Civil Action No. 2:23-cv-00408-RDP |

**DEFENDANTS' BRIEF REGARDING ISSUES TO BE ADDRESSED AT THE 10/1/2024 STATUS CONFERENCE**

  Defendants Viceroy Research LLC, Fraser Perring, Gabriel Bernarde, and Aidan Lau (collectively "Viceroy") respectfully submit this brief summarizing the relevant issues in advance of the parties' status conference with the Court on October 1, 2024. In support of its imminent motion for summary judgment, Viceroy intends to file multiple MPT-produced documents to prove that the statements that MPT alleges are defamatory are true—which is a complete defense to a defamation claim. MPT has objected to these documents being filed in the public record and insists that they be filed under seal. Viceroy contends that nothing in these documents is sufficient to overcome the strong presumption of public access, and that it is MPT's burden to promptly file a motion to seal the documents if it believes it can overcome that strong presumption (which motion Viceroy will oppose). The following summarizes Viceroy's position.

**FACTS**

A.  **Background**

Viceroy is a research and investing group that typically publishes articles on publicly-traded companies that it believes are overvalued, stating the publicly available facts that it believes support its opinions. Viceroy typically takes short positions against the companies that it publishes about, and, thus, its members stand to gain financially when the companies' stock prices go down—a fact which Viceroy discloses in its research reports.

MPT is a publicly-traded real estate investment trust ("REIT") that purchases hospital real estate from hospital operators and leases those hospitals back to the operators.

In early 2023, Viceroy published a series of articles about MPT, disclosing that Viceroy was short MPT's stock and stating the reasons why it believed MPT was overvalued. Its thesis was that MPT was, in effect, running a compensation scheme, whereby MPT purchased hospital real estate from financially strapped operators at significantly inflated prices, and saddled the operators with crippling leases based on the inflated property values. MPT then provided financial support to the tenants through uncommercial loans and other transactions to attempt to infuse them with capital so that they could, among other things, pay MPT's crippling rents (a scheme referred to as "round tripping"). It further contended that MPT was fraudulently misleading investors about the financial health of its tenants, representing that they were liquid and solvent, when in fact they were insolvent and in desperate need of working capital, which MPT secretly provided them. It contended that this scheme was orchestrated by MPT's executives, including Edward K. Aldag, Jr.—MPT's CEO and Chairman of the Board—who made tens of millions of dollars through a recklessly-designed compensation structure that

awarded executives based on property acquisitions and growth—which fueled MPT's inflated real estate purchases and the crippling lease bases it imposed on its tenants.

MPT's defamation complaint asserts four categories of actionable statements that Viceroy published about MPT: (1) that MPT round tripped money to its financially distressed tenants through uncommercial transactions so that its tenants could pay rent; (2) that MPT concealed and lied about its dealings with Steward; (3) that MPT and its executives engaged in fraudulent and criminal activities, including securities fraud; and (4) that MPT's executives were improperly motivated by a compensation structure that awarded them for acquisitions and growth. *See* Compl. (ECF # 1), at ¶ 45. As will be discussed below, Viceroy intends to prove that MPT's own documents establish that these alleged defamatory statements are true.

**B.     Recent Developments with MPT's Largest Tenant—Steward**

Viceroy's reports were prescient. Despite MPT's representations to the contrary, Steward Health Care ("Steward"), who was MPT's largest tenant, was, at all relevant times, deeply insolvent. This culminated in its filing for Chapter 11 bankruptcy in May 2024—one of the largest hospital bankruptcies ever. In the bankruptcy proceedings it was revealed that Steward was indebted to MPT in the amount of $7.5 billion, including $6.6 billion in current and future rent obligations. *See In re: Steward Health Care System, LLC*, Case No. 24-90213 (Bankr. S.D. Tex.) ("Steward Bankr. Docket"), Declaration of John R. Castellano dated 9/10/2024 (ECF# 2419), at ¶ 8.[1]

The bankruptcy proceeding has validated Viceroy's thesis that, among other things, MPT had vastly overvalued Steward's hospitals and saddled Steward with unsustainable leases. For example, on July 26, 2024, Steward moved the court to authorize rejection of its master lease

---

[1] Available at https://restructuring.ra.kroll.com/Steward/Home-DownloadPDF?id1=MzIwNjg1NA==&id2=-1

with MPT covering eight hospitals in Massachusetts (referred to as Master Lease II). The supporting rationale for the rejection was that Steward's "hospitals in Massachusetts generate significant operating losses (including on account of the $114 million in rent obligations under Master Lease II)." Steward Bankr. Docket, Declaration of John R. Castellano dated 7/26/2024 (EFF # 1713), at ¶ 17.[2] Further, the bids that Steward received for the underlying hospitals "contemplate[d] a purchase price…significantly less than the value of the real estate implied by the rent obligations and the lease base under Master Lease II," which indicated that MPT's "investment in such real estate [was] substantially impaired." *Id.* Therefore, there was "no scenario in which a buyer of the [Massachusetts hospitals] [would] be assuming Master Lease II or the rent obligations thereunder." *Id.*

The bankruptcy court granted the motion and rejected Master Lease II. Steward Bankr. Docket, Order dated 7/31/2024 (ECF # 1782), at ¶ 1.[3] Upon the rejection, MPT surrendered the properties to the properties' mortgage holder and recorded a $410 million impairment on its equity interest in the real estate. *See* MPT Form 10-Q, 2Q 2024, at p. 35.[4] Ironically, this is the very investment that MPT touted in its Complaint as "validat[ing] MPT's original underwriting," when, in reality, the investment ***invalidated*** said underwriting. *See* Compl. (ECF # 1), at ¶ 25.

Steward then moved the bankruptcy court to reject the remaining leases it had with MPT (which are all part of "Master Lease I"). *See* Steward Bankr. Docket, Motion to Reject Master Lease I (ECF # 2026).[5] Steward argued that "the terms of Master Lease I are expensive and

---

[2] Available at https://restructuring.ra.kroll.com/Steward/Home-DownloadPDF?id1=MzE0MzAyOQ==&id2=-1.

[3] Available at: https://restructuring.ra.kroll.com/Steward/Home-DownloadPDF?id1=MzE1MDExMw==&id2=-1.

[4] Available at: https://medicalpropertiestrust.gcs-web.com/static-files/4036adf5-29b9-4742-970a-e4527b94fc1d.

[5] Available at: https://restructuring.ra.kroll.com/Steward/Home-DownloadPDF?id1=MzE3MjMxNA==&id2=-1.

4

burdensome, with significantly above-market rental obligations. The rent and other payment obligations under the Master Leases are substantial and have crippled [Steward's] operations for years. Since 2022 alone, even *after* accounting for certain rent concessions provided to [Steward]…, [Steward] ha[s] paid MPT over $870 million between Master Lease I and Master Lease II…." *Id.* at ¶ 5.

Following this motion, Steward and MPT reached a global settlement that resulted in (1) all of MPT's remaining leases with Steward being cancelled, (2) Steward—not MPT—receiving substantially all of the proceeds of the sale of a group of hospitals in Florida, and (3) Steward's surrender of its remaining operations to MPT, as MPT struggles to find new operators—to whom MPT is providing substantial financial support—who can pay MPT rent under new leases. *See generally* Steward Bankr. Docket, Settlement Term Sheet (ECF # 2418-1);[6] MPT 8-K dated 9/11/2024,[7] at p. 1 (describing the settlement and noting, among other things, that MPT is agreeing to lend the new operators up to $80 million for working capital purposes).

In addition to creating a public health crisis, Steward's collapse has been an unmitigated disaster for MPT. Since late 2023, MPT has recorded over $2.0 billion in impairments related to Steward alone, including complete write-offs of outstanding rent owed by Steward, hundreds of millions of working capital and other loans that MPT made to Steward (which will be the subject of our summary judgment motion), MPT's investments in Steward real estate, and MPT's 9.9% equity interest in Steward, among other things. *See* MPT 8-K dated 9/11/2024, at pp. 1-2.

MPT's conduct in funneling money to Steward to mask Steward's insolvency has drawn substantial ire from public officials. For example, on April 15, 2024, U.S. Senators Elizabeth

---

[6] Available at: https://restructuring.ra.kroll.com/Steward/Home-DownloadPDF?id1=MzIwNjg1MQ==&id2=0.

[7] Available at: https://medicalpropertiestrust.gcs-web.com/static-files/18cdfb6b-8e24-4f08-a7dc-9ddb80c3f32d.

Warren and Edward J. Markey sent a letter to MPT's Aldag seeking "information of the role of [MPT]… in the ongoing financial crisis facing [Steward] in Massachusetts." *See* Letter from Senators Warren and Markey dated 4/15/2024, at p. 1.[8] The senators remarked that the hundreds of millions in loans that MPT made to Steward beginning in 2018 "have all the appearances of a Ponzi scheme that is continuing to harm Steward hospitals: MPT continued to provide capital to Steward, which allowed the hospitals to continue paying rent to MPT. This allowed MPT to avoid devaluing its real estate purchases and leases that it held, bolster its stock price, and report lucrative cash flows." *Id.* at p. 2. The senators concluded that "MPT has—along with Steward—plundered these hospitals." *Id.* at p. 3.

C.     **The Current Motion that Viceroy Intend to Bring**

As mentioned immediately above, based on the publicly-known facts, public officials have determined that MPT appears to be running a "Ponzi scheme." But in reality, the situation is much worse. Without getting into specifics (until the Court resolves the sealing issue), MPT's documents produced to date prove that Steward has been in financial crisis for years. They also prove that MPT has infused Steward with hundreds of millions of dollars of working capital to attempt to mask its insolvency, which it accomplished through sham and uncommercial transactions. MPT then deliberately misled investors about Steward's financial health and the purpose and nature of the sham transactions.

Viceroy, therefore, intends to move for summary judgment on MPT's claims on the bases that, among other things, the alleged defamatory statements that Viceroy made about MPT round-tripping money to Steward, MPT's uncommercial transactions with Steward, and MPT's

---

[8] Available at:
https://www.warren.senate.gov/imo/media/doc/2024.04.15%20MPT%20and%20Macquarie%20Letter.pdf

acts of fraud are true—which is a complete defense to a defamation claim. While discovery is still ongoing, we have concluded that the documents produced to date, in addition to the developments regarding Steward's bankruptcy, make this case ripe for summary judgment. It is important to move for summary judgment now, as Viceroy understandably wants to avoid incurring substantial additional costs as it continues to defend a frivolous suit that should never have been brought.

To this end, on August 20, Viceroy notified MPT that it intended to move for summary judgment and described the nature of the documents that it intended to rely upon in support of said motion. Viceroy notified MPT that it was its position that these documents should not be filed under seal. As MPT concedes, the documents consist primarily of internal emails, board presentations, transactional negotiations, financial information, and advice from third party advisors—all related to transactions that Viceroy contends were, in reality, uncommercial transactions designed to infuse Steward with working capital so that it could pay rent. Three days later, on August 23, 2020, Viceroy identified by bates number 70 documents that it may rely upon in support of its motion. To date, MPT has objected to the filing of any of these documents in the public record, but has failed to articulate any authority justifying its position.

## ARGUMENT

### A. Viceroy Is Entitled to File Its Summary Judgment Motion Now

Unless a different time is set by local rule or court order, "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Thus "a defendant may move for summary judgment 'at any time,' and the rule does not require that discovery be completed before the motion is heard." *Alholm v. American Steamship Co.*, 144 F.3d 1172, 1177 (8th Cir. 1998).

Here, Viceroy intends to move for summary judgment on issues that are uniquely in the possession of MPT—i.e., the truth of the alleged defamatory statements about MPT's conduct. The parties have had ample time for discovery on this issue, and Viceroy believes that MPT's documents produced in discovery prove conclusively that the alleged defamatory statements about MPT are true. If MPT believes that a motion for summary judgment is premature, the proper procedure is not to prohibit Viceroy from moving for summary judgment; rather, once the motion is filed, MPT must file a declaration under Rule 56(d) setting forth the reasons why it cannot present facts essential to justify its opposition.

**B.     MPT Cannot Overcome the Presumptive Right of Public Access**

Courts "have long recognized the general right to inspect and copy public records and documents, including judicial records and documents." *In re Blue Cross Blue Shield Antitrust Litig.*, 2016 WL 7026339, at *2 (N.D. Ala. 2016) (Proctor, J.) The "operations of the courts and the judicial conduct of judges are of the utmost public concern…, and the common law right of access to judicial proceedings, an essential component of our judicial system, is instrumental to the integrity of the process…." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (citations and internal quotations omitted). This "right includes the right to inspect and copy public records." *Id.*

Once "a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case." *Brown v. Advantage Engineering, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992). Absent "a showing of extraordinary circumstances set forth by the district court…, the court file must remain accessible to the public." *Id.*

Materials "filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common law right" of access. *Romero,* 480 F.3d at 1245. Documents

8

"filed as part of a dispositive motion, such as a summary judgment motion, assist the court in determining the parties' substantive rights, serve as a substitute for trial, and render those documents judicial." *Turner v. Alabama Agricultural and Mechanical Univ.*, 2019 WL 13038611, at *1 (N.D. Ala. 2019).

Thus, materials "submitted to a court in connection with a summary-judgment motion [are] entitled to a strong presumption of access." *In re: Blue Cross*, 2016 WL 7026339, at *3. Since "such [] document[s] [are] the basis for adjudication, only the most compelling reason can justify sealing." *Id.*

Importantly, "[l]itigants may not override the presumption of public access by simply referring a protective order." *Id*. Rather, "district courts must scrutinize sealing requests; otherwise, parties could effectively circumvent the public's right of access to judicial documents through the expedient of labelling everything confidential." *Id.* (citing cases).

The presumptive right of access, while strong, is not absolute, and can be overcome by a showing of good cause, "which requires balancing the asserted right of access against the other party's interest in keeping the information confidential." *Romero*, 480 F.3d at 1246 (citations and internal quotations omitted). In balancing the interest, courts consider, among other things, "whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Id.*

More specifically to this case, in "civil litigation, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by

9

statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is typically enough to overcome the presumption of access." *In re: Blue Cross*, 2016 WL 7026339, at *3. Further, where, as here, a party voluntarily puts the relevancy of the disputed documents at issue, that party cannot conceal those documents from the public by filing them under seal. *Id.* at *4-5 ("Similarly, here, by filing their Motion based on rates filed with the Alabama Department of Insurance, Defendants have put those rates at issue, and have waived any privilege that might have otherwise attached to an examination of its market conduct.").

The "burden is on the party seeking to seal materials to show that there is good cause to do so." *Hill v. Averett*, 2024 WL 1007418, at *2 (N.D. Ala. 2024).

Applying the above law here, MPT cannot meet its burden of overcoming the "strong presumption of access" to documents filed in support of a motion for summary judgment. *In re: Blue Cross*, 2016 WL 7026339, at *3. First, none of the documents are trade secrets, privileged, or required by statute to be held in confidence, which this Court has recognized are the "only" types of documents that typically are afforded confidential treatment. *Id.* Second, these are documents that MPT voluntarily put at issue by filing the instant action against Viceroy, placing the truth of Viceroy's alleged defamatory statements (and thus MPT's documents related to the disputed transactions) as a core issue in this litigation. Having done so, MPT cannot now claim the documents that prove (or disprove) the truth of Viceroy's alleged defamatory statements should be hidden from the public. *Id.* at *4-5.

Additionally, the other factors outlined in *Romero*, *supra*, favor upholding the presumption of public access:

- <u>Sealing would impair court functions.</u> Sealing would create a piecemeal judicial record, cluttered with redactions in the parties' statements of fact and responses thereto, and the declarations and exhibits proffered in support of the parties' respective briefs. Further, when addressing the arguments based on the filed

documents, the Court cannot be expected to undertake the onerous task of sifting through a substantial and complex record to determine what is sealed versus unsealed in choosing what to cite in its ensuing order on the motion. Requiring the exhibits to be filed under seal is untenable.

- <u>Public access will not impair legitimate privacy interests or cause undue injury to MPT.</u> The documents at issue do not implicate trade secrets, privilege, or statutorily protected confidential information. They are documents that MPT put at issue by voluntarily filing a defamation claim against Viceroy. If MPT believes the disclosure of these documents will cause it harm, it should not have filed a lawsuit putting the transactions and the issue of truth at the forefront of a very public dispute.

- <u>The information is reliable.</u> Clearly the information is reliable as it is coming from the files of MPT.

- <u>MPT will have the ability to respond to the documents.</u> MPT, Steward, and any of the other corporate giants implicated in the private equity debacle that created the Steward health care crisis are equipped with powerful PR resources that regularly respond to information published about their companies. Indeed, all parties regularly issue statements on their websites purporting to "correct" the record in response to the myriad public and media agencies that have condemned their actions. *See, e.g.,* "MPT Corrects the Record" post on MPT's website.[9]  MPT is a sophisticated party with an abundance of resources that is capable of defending itself against public critics. This factor strongly favors public access.

- <u>The controversy involves matters of public concern.</u> At issue in this suit is MPT's conduct related to a national public health crisis resulting from what Viceroy contends is deceptive and fraudulent conduct that led to the demise of the country's largest private hospital chain. Steward's demise and MPT's role in it has been the subject of continuous media coverage and public investigations. This is clearly a matter of public concern, and this factor strongly favors public access.

## **CONCLUSION**

For all of these reasons, MPT has not and cannot meet its burden of overcoming the strong presumption of public access. If MPT believes otherwise, Viceroy respectfully requests that MPT be ordered to promptly file a motion to seal the documents it believes are entitled to

---

[9] Available at: https://cdn.prod.website-files.com/628fe2259e1c5d1172a8cca9/663ace79125b1c3a8b431842_Record%20Correction%205-7-24%20Final.pdf.

11

such protection. Viceroy further requests that the Court order expedited briefing on said motion to allow the Court to reach a prompt resolution of these matters so that Viceroy can procced with its motion for summary adjudication of the merits of this suit.

Dated: 9/24/2024

Respectfully Submitted,

/s/ *J. Ken Thompson*
J. Ken Thompson (ASB-1422-P67J)
Attorney at Law
P.O. Box 43116
Birmingham, AL 35243
201-601-5624
kent@jkenthompsanlaw.com

Richard M. Elias
ELIAS LLC
27 W. Lockwood Ave.
St. Louis, MO 63119
314-691-6824
relias@eliasllc.com

*Attorneys for Defendants*

**Certification Pursuant to Section C of the Initial Order**

Counsel hereby certifies that he has affirmatively and diligently sought to submit to the Court only those documents, factual allegations, and arguments that are material to the issues to be resolved in the Motion, that careful consideration has been given to the contents of this submission to ensure that it does not include vague language or an overly broad citation of evidence or misstatements of the law, and that this submission is non-frivolous in nature.

*/s/ Richard M. Elias*